UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA         :

      v.                                                      :       **21 Cr. 263 (VM)**

**MANUEL ANTONIO SUQUILANDA**,  :

                       Defendant.  :
------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT AS IT WAS OBTAINED IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSITUTION AND IN VIOLATION OF THE JURY SELECTION AND SERVICE ACT**

        This memorandum of law is submitted in support of Mr. Suquilanda's motion to dismiss the indictment under the under the Sixth Amendment right to a grand jury drawn from a fair cross section of the community, under the Equal Protection Clause of the Fifth Amendment and under the Jury Selection and Service Act of 1968, 28 U.S.C. §1861, et seq. (hereinafter "JSSA").[1]

**I.    INTRODUCTION**

        While the right to trial by an impartial jury is a fundamental pillar of our criminal justice system, this country has long failed to enforce this right due to the persistent exclusion and

---

[1] This memorandum of law is substantially similar to the memorandum filed in *United States v. Li*, 20 Cr. 568 (AT), Dkt. No. 32, which is currently pending before the Honorable Analisa Torres. Indeed, Mr. Suquilanda relies on the defense expert's findings regarding data produced in *Li* in making his arguments herein. *See* Exhibit B. The government responded to the motion in *Li* on March 29, 2021, Dkt. No. 35, and the defense replied on April 12, 2021, Dkt. No. 36. No decision has yet been issued. Similar motions, regarding the Foley Square grand juries, are pending throughout this District. Decisions have been issued on similar motions regarding Foley Square petit juries, *see, e.g.*, *United States v. Tagliaferro*, 19 Cr. 472, 2021 WL 1172502 (S.D.N.Y. Mar. 29, 2021); *United States v. Chandler*, 19 Cr. 867 (PAC), Dkt. No. 64 (S.D.N.Y. May 5, 2021).

underrepresentation of people of color in juries. In the wake of the Civil Rights Movement, to address this problem, the Courts adopted the "fair cross section" standard requiring jury wheels, panels, and venires to represent the demographics of the community. *See Taylor v. Louisiana*, 419 U.S. 522, 528 (1975).[2] Yet, at present, in the Southern District of New York, Black and Latino individuals continue to be systematically underrepresented in the District's jury lists. The grand jury that indicted Mr. Suquilanda was drawn from pool from which approximately one-third of the expected Latino people and one-quarter of the expected Black people were missing. This District has tolerated the systematic exclusion of Black and Latino jurors for too long and, unaddressed, the problem is worsening. The indictment against Mr. Suquilanda should be dismissed.[3]

## II.     STATEMENT OF FACTS

### A.     Procedural History

Mr. Suquilanda was presented in the Southern District of New York on March 23, 2021 on a criminal complaint. *See* Dkt. No. 4. An indictment was filed in the above-captioned case on April 21, 2021. Dkt. No. 7. On April 29, 2021, the Court granted Mr. Suquilanda's requests (made with the consent of the government) for (1) authorization to inspect grand jury records relating to the composition of the grand jury and (2) a 30-day stay of any deadline for a jury-based challenge to the indictment. Dkt. No. 11.

---

[2] For history on the underrepresentation and exclusion of minority jurors from jury service, *see Illegal Racial Discrimination in Jury Selection: A Continuing Legacy*, Equal Justice Initiative, *available at:* https://eji.org/wp-content/uploads/2019/10/illegal-racial-discrimination-in-jury-selection.pdf.

[3] A defendant need not be a member of an excluded group to bring the instant challenge, *see Holland v. Illinois*, 493 U.S. 474, 477 (1990), but the rap sheet provided by the government identifies Mr. Suquilanda as Hispanic—i.e. a member of one of the underrepresented groups identified in this motion.

**B.     The Southern District of New York's Jury Plan**

The JSSA requires each federal district court to "devise and place in operation a written plan for random selection of grand and petit jurors."  28 U.S.C. § 1863(a).   In 2009, the Southern District of New York set forth a plan to determine the selection of petit and grand jurors in The Amended Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York.  *See* Exhibit A, Jury Plan.   The Southern District's Jury Plan uses voter registration lists as the exclusive source of names of prospective jurors.  *Id.*, Art. III.A; *United States v. Biaggi*, 909 F.2d 662 (2d Cir. 1990) (examining previous jury plan).   From these names, two master jury wheels are constructed: one for the Manhattan courthouse and one for the White Plains courthouse.   For the master wheels, jurors from each county are drawn from that county's voter registration list in the same proportion to the total number of jurors drawn as that county's number of registered voters bears to the total number of registered voters for all of the counties in the respective wheels.   *See* Exhibit A, III.A.1, III.B.

The Manhattan master wheel (also called the Foley Square division) contains names drawn from the counties of New York, Bronx, Westchester, Putnam, and Rockland.   The White Plains master wheel contains names from Westchester, Putnam, Rockland, Orange, Sullivan, and Dutchess counties.   For the three overlapping counties (Westchester, Putnam and Rockland), the names are apportioned among the two master wheels so as to "reasonably reflect the relative number of registered voters of each county" within the respective wheels.  *Id.*, Art. IV.B. According to the Jury Plan, the "master jury wheels shall be emptied and refilled by not later than September 1 following the date of each Presidential Election."  *Id.*, Art. III.B; *see also United States v. Reyes*, 934 F. Supp. 553 (S.D.N.Y 1996).

3

At least once a year, names are drawn randomly from the master jury wheels in an amount sufficient to meet the anticipated demand for jurors for the next six months. *Id.*, Art. III.D. The people whose names are drawn are sent questionnaires for the purpose of determining their qualifications to sit as jurors. *Id*. Potential jurors are instructed to complete the questionnaire and return it within ten days. *Id.*, Art. III.E. The names of persons who complete and return the questionnaire, and who are found to be qualified as jurors, constitute the qualified jury wheels. *Id.*, Art. III.C. As with the master wheels, two separate qualified jury wheels are maintained: one for Foley Square and one for White Plains. When jurors are needed, names are drawn at random from these wheels. Summonses are sent to those whose names are drawn. *Id.*, Art. IV.C; *Reyes*, 934 F. Supp. at 556.

## III.    SIXTH AMENDMENT CHALLENGE

The Sixth Amendment guarantees a criminal defendant a jury selected from a fair cross section of the community. *Taylor*, 419 U.S. at 530. In *Duren v. Missouri,* the Supreme Court set forth the three elements that must be shown to establish a *prima facie* violation of the fair-cross-section requirement: (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. 439 U.S. 357, 364 (1979).

Unlike a challenge brought under the Fifth Amendment, "a jury selection system yielding a significant underrepresentation of a minority group in jury venires can violate the 'fair cross-section' requirement of the Sixth Amendment, even if proof of discriminatory intent necessary

4

for a Fifth Amendment violation is absent." *Biaggi,* 909 F.2d at 677, *citing Duren*, 439 U.S. at 368 n.26.

Once the defense makes a *prima facie* showing of systematic underrepresentation of a distinctive group, it becomes the Government's burden to justify this underrepresentation "by showing attainment of a fair cross section to be incompatible with a significant state interest." *Duren*, 439 U.S. at 368-69.

### A.     First Prong of *Duren*: Distinctive Group

Black and Latino people are "distinctive" groups in the community, and a claim of underrepresentation of those groups meets the first prong of a fair-cross section claim. *United States v. Jackman*, 46 F.3d 1240, 1246 (2d Cir. 1995).

### B.     Second Prong of *Duren*: Significant Underrepresentation

In considering the second *Duren* element, the Court must determine "whether either or both of these two 'distinctive' groups are 'significant[ly] underrepresent[ed]' in the jury selection process." *Id.* (citing *Biaggi*, 909 F.2d at 677). The relevant comparison, for purposes of assessing the representativeness of the system, is between the number of minority persons in the population and the number of persons belonging to the class found in the jury pool. *Id*. (citing *Duren*, 439 U.S. at 365-66).

Over the years, the Second Circuit has utilized various statistical models for evaluating claims of "significant underrepresentation." In *United States v. Rioux*, 97 F.3d 648, 655 (2d Cir. 1996), the Circuit reviewed the three most common models. First, "[s]tatistical decision theory ('SDT') calculates probabilities and measures the likelihood that underrepresentation could have occurred by sheer chance. Under this method, if one can determine that it is statistically improbable that the jury pool resulted from random selection, then there is imperfection in the

5

jury selection system. . . .The intellectual core of SDT is random selection." *Id*. SDT is the preferred method of calculating jury underrepresentation for at least one state supreme court. *See State v. Lilly*, 930 N.W.2d 293, 304 (Iowa 2019) (holding that the threshold for establishing systematic underrepresentation should be one standard deviation after rejecting the absolute disparity and comparative disparity methods).

Second, the absolute disparity method measures the difference between the group's representation in the general population and the group's representation in the qualified wheel. For example, if Black individuals compose 10% of the entire population but only 2% of the qualified wheel, the absolute disparity is 8%. This approach is the average difference in the number of jurors per venire due to the underrepresentation. *Rioux*, 97 F.3d at 655.

Third and finally, the comparative disparity method "measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service. Comparative disparity is calculated by dividing the 'absolute disparity' of a group . . . by the group's percentage of the population and then multiplying by 100%." *Id*.

Regardless of the method of analysis used, Black and Latino individuals are significantly underrepresented in the Manhattan qualified jury wheel. Jeffrey O'Neal Martin, a mathematician and an expert on the study of jury data, has analyzed the data under all three of the available statistical models. *See* Exhibit B, Declaration by Jeffrey Martin. Each model shows a "statistically significant"—and growing— underrepresentation of Blacks and Latinos in the jury pool.

Specifically, for the Manhattan Division Qualified Jury Wheel[4] refilled on February 7, 2017, Form AO-12 reflects the following absolute disparities:

- The Absolute Disparity for Black or African-American persons on the Qualified Jury Wheel is **5.11%** underrepresentation (21.19% minus 16.08%). *Id.* ¶ 33.

- The Absolute Disparity for Hispanic or Latino persons on the Qualified Jury Wheel is **9.03%** underrepresentation (28.44% minus 19.41%). *Id.* ¶ 34. Using the more recent American Community Survey 1 Year numbers would result in an Absolute Disparity of **9.88%**. *Id.* ¶ 35.

The analysis of the same data revealed the following comparative disparities:

- The Comparative Disparity for Black or African-American persons from the Qualified Jury Wheel is **24.12%** underrepresentation (5.11% divided by 21.19%). That is, nearly one-quarter of the Black or African-American persons we were expecting in the Qualified Jury Wheel are missing. *Id.* ¶ 39.

- The Comparative Disparity for Hispanic or Latino persons from the Qualified Jury Wheel is **31.75%** underrepresentation (9.03% divided by 28.44%). *Id.* ¶ 40. That means nearly one-third of the Hispanic or Latino persons we were expecting in the Qualified Jury Wheel are missing. *Id.* Using the more recent American Community Survey 1 Year numbers would result in a Comparative Disparity of **33.73%**. *Id.* ¶ 41.

The degree of underrepresentation reflected in the data for both Black and Latino persons is significantly greater than the level of underrepresentation which the Second Circuit found troubling in *United States v. Biaggi*. In *Biaggi*, the Second Circuit, relying on the absolute disparity test to assess underrepresentation, found an absolute disparity of 3.6% for Black individuals and 4.7% for Latino individuals. 909 F.2d at 677. The district court found that the

---

[4] Some courts have limited their analysis to the master wheel. *See, e.g.*, *Tagliaferro*, *supra*. We urge the Court to decline to follow this lead. First, the qualified jury wheel incorporates all of the errors outlined by Mr. Martin, as any defect in the master wheel is—by design—passed on to the qualified wheel. Second, the qualified wheel is the first level of the Southern District's jury selection process for which we have reliable demographic data, *i.e.*, the information at the heart of this challenge. *See* Declaration from Jeffrey Martin in *United States v. Nieves*, 19 Cr. 354 (JSR), Dkt. No. 87-3, at ¶ 97. This information comes from self-reported racial and ethnic data provided by prospective jurors when they return their qualification questionnaires. *Id.* ¶ 16; 97.

"addition of two Blacks and three Hispanics to a venire of a typical size would be required to eliminate underrepresentation." *Id*. at 678. In affirming the district court's denial of the Sixth Amendment challenge, the Circuit noted that "the facts of this case press the . . . 'absolute numbers' approach to its limit, and [it] would find the Sixth Amendment issue extremely close if the underrepresentation had resulted from any circumstance less benign than use of voter registration lists." *Id*. The current absolute disparities of 5.11% and 9.03% for Black and Latino individuals, respectively, in the Manhattan qualified jury wheel, crosses the threshold hinted at by the Second Circuit and reveals a steady and troubling trend towards less representation in this District.

Utilizing the third analysis method discussed in *Rioux*, the statistical decision theory ("SDT") or standard deviation analysis, confirms that the underrepresentation of Black and Latino persons is significant and systematic. Applying SDT, Mr. Martin found that the percentage of Black and Latino persons on the qualified jury wheel differs from the percentage of Black and Latino persons in the population by more than 3 standard deviations. Exhibit B, ¶¶ 44, 45. Mr. Martin concluded that the underrepresentation of both Black and Latino persons "is not the result of random factors, chance, or luck, but is the result of a systematic practice that underrepresents [those distinctive groups]." *Id*.

The systematic underrepresentation of Black and Latino individuals is matched by the significant overrepresentation of white individuals in the qualified jury wheel. White individuals are overrepresented in the jury wheel by 7.99%. *See id.* ¶23, 28. Individuals identifying as Black or Latino, considered together, are underrepresented by a striking 12.70%. *Id.* ¶ 36. The jury pool cannot reflect a "fair cross section" of the community when community members of color are underrepresented while white community members are overrepresented.

8

This imbalance is particularly troubling given the disproportionately negative outcomes Black and Latino people face in the criminal justice system.[5]

### C.      Third Prong of *Duren*: Systematic Exclusion

The underrepresentation of Black and Latino people on the Manhattan qualified jury wheel is the result of "systematic exclusion in the jury-selection process," *Duren*, 439 U.S. 366, as indicated by the continued existence of these disparities—and in fact, their increase—over an extended period of time.   Accordingly, Mr. Suquilanda has satisfied prong three of the *Duren* standard, and with it, established a *prima facie* case of a Sixth Amendment violation.

A defendant may establish that the underrepresentation of a distinctive group is due to systematic exclusion by showing that the underrepresentation occurred over a significant time period.  *See Biaggi*, 909 F.2d at 678.   The Sixth Amendment guarantee of the opportunity for a representative jury "can be imperiled if venires regularly lack even the small numbers of minorities necessary to reflect their proportion of the population."   *Id.; see also Duren*, 439 U.S. at 366 (defendant proved "large discrepancy occurred not just occasionally, but in every weekly venire for a period of nearly a year").

The underrepresentation of Black and Latino individuals in the qualified jury wheel is significant and persistent.   As explained above, 21.19% of eligible jurors in the Manhattan division are Black, but only 16.08% of the jurors on the qualified jury wheel are Black.   Exhibit B, ¶ 33.   This is an absolute disparity for Black individuals on the qualified jury wheel of 5.11%.  *Id.*   In addition, 28.44% of eligible jurors in the Manhattan Division are Latino individuals, but only 19.41% of the jurors on the qualified jury wheel are Latino.  *Id.* ¶ 34.   This

---

[5] Sommers, Samuel R., and Satia A. Marotta. *Racial Disparities in Legal Outcomes: On Policing, Charging Decisions, and Criminal Trial Proceedings.*   Policy Insights from the Behavioral and Brain Sciences 1, no. 1 (October 2014): 103–11, *available at*: https://journals.sagepub.com/doi/pdf/10.1177/2372732214548431.

is an absolute disparity for Latino people on the qualified jury wheel of 9.03%.  *Id.*  This extremely high level of disparity for Latino people represents the peak (for now) of what has been an historical trend of increase in disparity in the qualified wheel since 2010.  *See id.* ¶¶ 47-50.  Beginning with a slight overrepresentation of Latino individuals in the qualified wheel of .29% in 2010, the disparity has continually increased:



        0.11% under representation in 2011;
        0.68% under representation in 2012;
        3.26% under representation in 2013;
        3.75% under representation in 2014;
        4.28% under representation in 2015;
        4.77% under representation in 2016;
        8.56% under representation in 2017;
        8.69% under representation in 2018;
        9.07% under representation in 2019.

*Id.* ¶¶ 51, 52.  This 10-year pattern of increasing underrepresentation of Latino individuals in the

qualified jury wheel plainly constitutes a "regularly" occurring underrepresentation, such that the right to a jury made of a fair cross section of the community may be "imperiled." *Biaggi*, 909 F.2d at 678.

The systematic nature of this exclusion is also reinforced by the fact that the disparities created by the nature of the jury-selection system in the Southern District have been known since at least 1996. In *United States v. Reyes*, Judge Scheindlin analyzed this system in addressing the defendant's claim that Black and Latino people were unconstitutionally underrepresented in the pool from which the grand jury was drawn. 934 F. Supp. at 555. At that time, the numbers revealed (depending on the methodology employed) a range from 2.17% disparity for Black people and 1.93% disparity for Latino people to 4.03% disparity for Black people and 3.42% disparity for Latino people. *Id.* at 565-66. The district court held that these absolute disparities, which even at the highest estimates are less than half of the percentages at issue in Mr. Suquilanda's case, did not violate the Sixth Amendment. *Id.* at 566. The district court noted, however, that "a finding that the above disparities are not unconstitutional is not the same as an endorsement of such discrepancies." *Id.* Moreover, the district court stated that "serious consideration should be given to amending the jury selection procedures in the Southern District of New York." *Id.* But the relevant features of the system have remained the same, and the discrepancies have worsened.

The significance of the failure to modify a system that was known, at least as of 1996, to result in underrepresentation, is that it weighs against a finding of "benign" circumstances that might excuse a significant underrepresentation. *See Biaggi*, 909 F.2d at 678 (concluding that the absolute disparity for Black or African-American persons of 3.6% and for Hispanic or Latino persons of 4.7% "press[es] the . . . 'absolute numbers' approach to its limit, and would [make]

11

the Sixth Amendment issue extremely close if the underrepresentation had resulted from any circumstance less benign than use of voter registration lists"). What perhaps in 1990 could be labeled a "benign" cause of the disparities resulting from the jury-selection process in the Southern District can no longer be deemed so 30 years later, in light of the now long-time awareness of the disparity caused by the system. Addressing what constitutes "benign" circumstances, the Second Circuit in *United States v. Jackman*, held that the facts in its case were "far less than benign," given that the underrepresentation in the qualified jury wheel, which had been caused by the inadvertent exclusion of all residents from the two cities in the Hartford Division that contained the majority of the voting-age Black and Latino population from the jury list, "continued for more than a year after disclosure of constitutional infirmities in the selection process." 46 F.3d 1240, 1247 (2d Cir. 1995). Where the system's creation of problematic disparities have been known for at least the 25 years since the decision in *Reyes*, the underrepresentation in this case is the result of systematic exclusion.

Having established a *prima facie* case of systematic underrepresentation, it is now the Government's burden to present evidence that attaining a fair cross section is incompatible with a significant state interest. *Duren*, 439 U.S. at 368. Certainly the Government can choose not to defend the systematic circumstances that have led to the persistent and increasing underrepresentation of Blacks and Latinos from Manhattan jury lists.

## IV.  JSSA CHALLENGE

Litigants in federal court have a statutory right under the JSSA to "grand and petit juries selected at random from a fair cross-section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861 (1994). Title 28 U.S.C. § 1867 (a) and (d) provide that in criminal cases a defendant may move to dismiss an indictment and to stay any further

proceedings against him, if there has been a "substantial failure to comply" with the provisions of the JSSA in selecting the grand jury which indicted him or the petit jury to try his case, until such time as the failures have been corrected.

The JSSA sets out procedures for each federal district to randomly select jurors from a "fair cross section of the community in the district or division wherein the court convenes," 28 U.S.C. § 1861, and states that no person is to be excluded from service as a juror for any invidious reason. *See id*. §§ 1862; 1863(a). The JSSA's "aim is to assure all litigants that potential jurors will be selected at random from a representative cross section of the community and that all qualified citizens will have the opportunity to be considered for jury service." H.R. Rep. No. 90-1076 (1968) ("House Report"), reprinted in 1968 U.S.C.C.A.N. 1792, 1792.

The JSSA forbids the exclusion of jurors based on their race or national origin. 28 U.S.C. § 1862 (1994). The JSSA also mandates that the procedures for selecting jurors "shall ensure that each county . . . within the . . . division is substantially proportionally represented in the master wheel for that judicial district, division or combination of divisions." 28 U.S.C. § 1863(b)(3). Finally, the JSSA authorizes the use of voter registration lists, 28 U.S.C. § 1863(b)(2), as long as they produce representative juries.

In order to prevail on a JSSA challenge, a defendant must show a "substantial failure to comply" with the JSSA. 28 U.S.C. § 1867(a). "Mere technical violations of the procedures prescribed by the Act do not constitute substantial failure to comply with its provisions." *United States v. LaChance*, 788 F.2d 856, 870 (2d Cir. 1986). To establish a violation based on group underrepresentation, a defendant must show that the representation of a distinctive group in the community is not fair and reasonable in relation to the number of such persons in the community, and that that underrepresentation is the result of systematic exclusion. *See*,

*e.g.*, *United States v. Rioux*, 97 F.3d 648, 654, 660 (2d Cir.1996). In short, "[t]he *Duren* test 'governs fair cross section challenges under both the [JSSA] and the sixth amendment.'" *Id*. at 660 (internal citations omitted). Thus for the reasons described above, the systematic exclusion of Black or African-American and Hispanic or Latino people from jury service and the systematic overrepresentation of white people violated Mr. Suquilanda's rights under the JSSA.

Beyond underrepresentation of Black and Latino persons, the total exclusion of "inactive" voters and of voters with alternate mailing addresses in Putnam County from the qualified wheel violates the JSSA. It is important to note that while these exclusions, discussed more fully below, likely contribute to underrepresentation, "prejudice" is not required in order to sustain a statutory violation of the JSSA. *See United States v. Jackman*, 46 F.3d 1240, 1250 (2d Cir. 1995) (Walker, J., dissenting) (absent failure to comply with procedural requirements, a JSSA statutory claim was viable notwithstanding lack of underrepresentation proof); *see also United States v. Contreras*, 108 F.3d 1255, 1266 (10th Cir. 1997) ("In the [Jury Selection and Service] Act, Congress set out a uniform, relatively strict scheme for jury selection. Congress included a new remedy for substantial violations of the Act, regardless of whether the litigant challenging the jury had been prejudiced by the jury.") (*quoting United States v. Kennedy*, 548 F.2d 608, 612 (5th Cir. 1977)). Indeed "[t]he legislative history of 28 U.S.C. § 1867(d) reveals that Congress deliberately excised a prejudice component that had existed in a prior version of the bill which was ultimately enacted as the Jury Selection and Service Act of 1968 and codified, in part, as Section 1867(d)." *United States v. Okiyama*, 521 F.2d 601, 604 (9th Cir. 1975) (citing House Report No. 1076); *see also United States v. Coleman*, 429 F. Supp. 792 (E.D. Mich. 1977) (dismissing indictment notwithstanding absence of proof that it caused any disparity).

Thus, the measure of whether a procedural irregularity is a violation of the statute turns on whether it is a "substantial" violation, as opposed to a technical one. That depends on whether or not an important JSSA policy is frustrated, and how significant the deviation is. *See, e.g.*, *Coleman*, 429 F. Supp. 792; *United States v. Davis*, 546 F.2d 583, 589 (5th Cir. 1977) ("Determining the substantial compliance question requires that the alleged violations of the Act be weighed against the goals of the statute."). As explained below, the exclusion of hundreds of thousands of registered voters frustrates important policies in the JSSA and the Jury Plan.

First, 304,884 people are excluded because they are considered "inactive" voters. Exhibit B, ¶ 64. "Inactive voters" are voters who are still registered to vote but whose status is changed to "inactive" because the county elections boards have received information, whether accurate or not, that the voter has moved. *See Common Cause/New York v. Brehm*, 432 F. Supp. 3d 285, 290 (S.D.N.Y. 2020) ("Voters are moved to inactive status when a County Board receives information indicating that a voter may no longer be living at her address of registration."). The information received by the county boards is often inaccurate. *See id.* at 293 ("In practice, tens of thousands of New York voters are improperly registered to vote as inactive, even though they continue to reside at their address of registration.") Judge Nathan, in her ruling in *Common Cause*, attributed this problem to flaws in the databases used: that of the United States Postal Service and the National Change of Address registry. *Id.*

The exclusion of inactive voters violates the Jury Plan and JSSA not only because it likely impacts the representativeness of the juries, *see* Exhibit B, ¶ 61, but because it substantially violates two provisions of the JSSA and the Jury Plan. First, the JSSA declares that "[i]t is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States…." 28

U.S.C. § 1861.   By excluding individuals who are registered to vote but are marked as "inactive," the jury selection process closes the door on the only available "opportunity to be considered for service" in SDNY: being a registered voter.

Second, their exclusion violates the clear language of the JSSA and the Jury Plan, which require, at minimum, the use of voter registration lists.[6]  "Voter registration lists" are defined, in relevant part, as "official records maintained by State or local election officials of persons registered to vote in either the most recent State or the most recent Federal general election…." 28 U.S.C. § 1869(c).   Thus, as a clear matter of statutory interpretation, anyone who is registered to vote in the most recent State or Federal general election should be on the lists. Inactive voters can be registered to vote at their precincts, but they are arbitrarily absent from the lists provided to the Jury Administrator.

Additionally, even though they are on the registered voter lists for the respective counties, individuals who included an alternate mailing address when registering to vote in Putnam County are arbitrarily excluded from potentially serving on the master jury wheel due to a technical glitch.   Exhibit B, ¶¶ 65, 66.   All told, 3,333 people are excluded this way.  *Id*. ¶ 67.

Combined, these two errors exclude 308,217 people from potential jury service.   This practice of exclusion, whether intentional or not, is no small or "technical" matter.   The violation is "substantial" because the exclusion of 308,217 people is an exclusion of nearly 12% of the total who should be present in the master wheel.  *Id*. ¶ 68.   This effect far exceeds the "non-substantial deviation" as described in the legislative history of the statute.   According to that history, a hypothetical non-substantial deviation from the plan would involve only a .5%

---

[6] The JSSA permits reliance on 'actual voter lists' but there is no indication that the SDNY uses lists of actual voters to create the Master Wheels.   To the contrary, the Jury Plan is specific in its exclusive reliance on "voter registration lists."

departure from the jury plan, or, for example using 1990 names instead of 2000.  *See Coleman*, 429 F. Supp. 792, 795 (describing House Report); see also *United States v. Carmichael*, 03 Cr. 259 (MHT), 2006 WL 8439345 n.78 (M.D. Ala. June 29, 2006), *report and recommendation adopted,* 467 F. Supp.2d 1282 (M.D. Ala. 2006), *aff'd,* 560 F.3d 1270 (11th Cir. 2009).   The exclusion of inactive voters and the mailing address error involve a much more significant effect on community residents' ability to serve.

## V.    CONCLUSION

For the above reasons, Mr. Suquilanda's rights, under the Sixth Amendment and under the JSSA, to a grand jury drawn from a fair cross-section of the community, were violated.   The indictment should be dismissed.

                                              Respectfully submitted,

                                              /s/
                                              Sylvie Levine, Esq.
                                              Federal Defenders of New York