# Exhibit A

1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**

9          **CENTRAL DISTRICT OF CALIFORNIA**

10

11   UNITED STATES OF AMERICA          )   Case No. CR 20-0057 FMO
                                       )
12                    Plaintiff,       )
                                       )
13         v.                          )   **ORDER RE: MOTION TO DISMISS**
                                       )
14   JOSE ALBERTO MEDINA ZEPEDA,       )
                                       )
15                    Defendant.       )
                                       )
16   _____  )

17         Jose Alberto Medina Zepeda ("defendant") is charged with illegal reentry in violation of 8

18   U.S.C. §§ 1326(a), (b)(2).  (See Dkt. 1, Indictment).  Defendant filed the instant Motion to Dismiss

19   (Dkt. 25, "Motion"), arguing that 8 U.S.C. § 1326 is unconstitutional and, therefore, the single-

20   count indictment should be dismissed.[1]  (See id. at 2).  Having reviewed and considered all the

21   briefing filed with respect to defendant's Motion, the court finds that oral argument is not necessary

22   to resolve the Motion, and concludes as follows.

23         Defendant contends that § 1326 violates the Equal Protection Clause because, although

24   it is facially neutral, it "was enacted with a discriminatory purpose and still has a disparate

25   impact[.]"  (Dkt. 25, Motion at 2) (citing Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429

26   U.S. 252, 97 S.Ct. 555 (1977) ("Arlington Heights")).  According to defendant, an Arlington Heights

27   _____

28         [1]  Unless otherwise indicated, all statutory references are to Title 8 of the United States Code.

analysis applies here and demonstrates that § 1326's enactment was "motivated by a racial purpose or object[,]" and therefore, the court should apply strict scrutiny to the review of the statute's constitutionality. (See Dkt. 25, Motion at 5 n. 7) (citing Hunt v. Cromartie, 526 U.S. 541, 546, 119 S.Ct. 1545, 1549 (1999) ("A facially neutral law, on the other hand, warrants strict scrutiny only if it can be proved that the law was 'motivated by a racial purpose or object[.]'")). The government responds that rational-basis review is the proper standard because of Congress's plenary power over immigration policy. (Dkt. 30, Government's Opposition to Defendant's Motion to Dismiss ("Opp.") at 5-7) (citing United States v. Hernandez-Guerrero, 147 F.3d 1075 (9th Cir. 1998)). The government contends that § 1326 is "well within the ambit of Congress's sweeping power over immigration matters[,]" (Dkt. 30, Opp. at 9) (quoting Hernandez-Guerrero, 147 F.3d at 1078), thus mandating rational-basis review of the statute. (See Dkt. 30, Opp. at 9).

In Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 140 S.Ct. 1891 (2020) ("DHS"), the Supreme Court applied an Arlington Heights analysis to a challenge to the government's decision to end the Deferred Action for Childhood Arrivals program. See id. at 1915-16 (plurality opinion). In Ramos v. Wolf, 975 F.3d 872 (9th Cir. 2020), the Ninth Circuit examined the plurality's choice of review standard in DHS in dealing with an Equal Protection challenge – brought in part by alien plaintiffs – to the Department of Homeland Security's decision to end the Temporary Protected Status program that "provides temporary relief to nationals of designated foreign countries that have been stricken by a natural disaster, armed conflict, or other extraordinary and temporary conditions in the foreign state." Id. at 878 (internal quotation marks omitted). The Ninth Circuit rejected the argument that the rational-basis standard applied to plaintiffs' Equal Protection challenge, noting that the Supreme Court has recognized that "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." Id. at 896 (quoting Zadvydas v. Davis, 533 U.S. 678, 693, 121 S.Ct. 2491, 2500 (2001)) (internal quotation marks omitted). "[O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." Zadvydas, 533 U.S. at 693, 121 S.Ct. at 2500. Indeed, "the entry fiction does not preclude non-

admitted aliens such as [defendant] from coming within the ambit of the equal protection component of the Due Process Clause." Kwai Fun Wong v. United States, 373 F.3d 952, 974 (9th Cir. 2004); see Padilla v. Immigration and Customs Enft., 953 F.3d 1134, 1146-47 (9th Cir. 2020) (same); California v. U.S. Dep't of Homeland Sec., 2020 WL 4440668, *18 (N.D. Cal. 2020) ("If Kwai Fun Wong establishes that non-admitted, but physically present aliens can bring an Equal Protection challenge, then it follows that admitted aliens . . . may also bring an Equal Protection challenge.").

Because § 1326 applies to "aliens who are already in the United States, [the government] cannot entirely rely on the plenary power doctrine to uphold the [statute]." California, 2020 WL 4440668, at *17. Here, the nature of defendant's Equal Protection claim and his presence within the United States weigh in favor of applying an Arlington Heights standard to his challenge. See, e.g., DHS, 140 S.Ct. at 1915-16 (plurality opinion) (applying Arlington Heights standard to Equal Protection challenge against an immigration policy); Ramos, 975 F.3d at 895-97 (same); California, 2020 WL 4440668, at *19-20 (same).

Under Arlington Heights, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." 429 U.S. at 265, 97 S.Ct. at 563. A party asserting an equal protection claim must show that racial discrimination was at least "a motivating factor" for the action being challenged. Id. at 265-66, 97 S.Ct. at 563-64. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Id. at 266, 97 S.Ct. at 564. This analysis involves inquiry into factors such as the "impact of the official action[,]" id., the "historical background of the decision[,]" id. at 267, 97 S.Ct. at 564, the "specific sequence of events leading up to the challenged decision[,]" id., "[d]epartures from the normal procedural [or substantive] sequence[,]" id., and the "legislative or administrative history[.]" Id. at 268, 97 S.Ct. at 565. A facially neutral law, such as the statute at issue here, "warrants strict scrutiny only if it can be proved that the law was 'motivated by a racial purpose or object[.]'" Hunt, 526 U.S. at 546, 119 S.Ct. at 1549; California, 2020 WL 4440668, at *19 ("[I]f plaintiffs are able to demonstrate racial

or ethnic discriminatory purpose to be a motivating factor of the [statute], then the court would apply a strict scrutiny standard of review.").

Defendant argues that "the original illegal reentry law was enacted with a discriminatory purpose and still has a disparate impact[.]" (Dkt. 25, Motion at 2). Defendant, relying on the Supreme Court's recent decisions in Ramos v. Louisiana, 140 S.Ct. 1390 (2020) ("Louisiana") and Espinoza v. Mont. Dep't of Revenue, 140 S.Ct. 2246 (2020) ("Espinoza"), contends that "when a court determines that a law's original enactment was motivated by a desire to discriminate . . . on account of race and the section continues to this day to have that effect, the court must conclude that the law violates equal protection under Arlington Heights." (Dkt. 25, Motion at 19) (internal quotation marks omitted); (see id. at 17-19). According to defendant, a detailed analysis of the historical background of the Undesirable Aliens Act of 1929 reveals that "racism and eugenics" were a motivating factor in the passage of that law. (See id. at 6-17). Defendant's contentions are unpersuasive.

In Louisiana, the issue was whether "the Sixth Amendment right to a jury trial . . . require[d] a unanimous verdict to convict a defendant of a serious offense." Louisiana, 140 S.Ct. at 1394 (footnote omitted). Although the Supreme Court noted the "racist origins" of the Louisiana and Oregon statutes at issue, the Court's reasoning primarily rested on an examination of common law rights to a unanimous jury verdict, i.e., "the historical meaning of the Sixth Amendment's jury trial right, [and] th[e] Court's long-repeated statements that [the Sixth Amendment] demands unanimity[.]" See id. at 1399-1402, 1405. The Supreme Court emphasized that the Sixth Amendment required "judges to assess the functional benefits of jury rules[,]" and this necessarily entailed "acknowledging the racist history of Louisiana's and Oregon's laws[.]" Id. at 1401 n. 44. Nevertheless, "a jurisdiction adopting a nonunanimous jury rule even for benign reasons would still violate the Sixth Amendment." Id.

In Espinoza, the Supreme Court examined "whether the Free Exercise Clause . . . barred" application of the Montana State Constitution's "no-aid" provision which prohibited the use of tuition assistance provided by the state when used toward religious schools. See 140 S.Ct. at 2251. Defendant asserts that the "majority relied on the law's 'checkered tradition' of underlying

religious discrimination, even though it was reenacted in the 1970s 'for reasons unrelated to anti-Catholic bigotry.'" (Dkt. 25, Motion at 18) (quoting Espinoza, 140 S.Ct. at 2259). However, the Espinoza Court did not rely on the Montana provision's "checkered tradition" as the basis for its decision. Rather, the Court invalidated the no-aid provision because it "bars all aid to a religious school simply because of what it is, putting the school to a choice between being religious or receiving government benefits." Id. at 2257 (internal quotation marks omitted). In addressing the Montana Department of Revenue's argument that the State's no-aid provision was supported by "a tradition *against* state support for religious schools [that] arose in the second half of the 19th century," the Court stated that "[t]he no-aid provisions of the 19th century hardly evince a tradition that should inform [the Court's] understanding of the Free Exercise Clause." Id. at 2258-59.

In short, the court is unpersuaded that Louisiana and Espinoza support defendant's contention that § 1326 should be judged according to legislative history from laws enacted decades earlier, and that "later reenactments do not cleanse the law of its original taint." (Dkt. 25, Motion at 18-19). Courts examining constitutional challenges to § 1325, a statute that also criminalizes unauthorized entry into the United States, have rejected arguments that rely "entirely on legislative history from the 1920s, decades before § 1325[] was enacted" and ignore later enactments of the actual statute at issue. See, e.g., United States v. Lucas-Hernandez, 2020 WL 6161150, *2-*3 (S.D. Cal. 2020) (rejecting identical interpretations of Louisiana and Espinoza where defendant ignored subsequent enactments of pertinent statute); United States v. Lazcano-Neria, 2020 WL 6363685, *7-*8 (S.D. Cal. 2020) (same).

Although § 1326 was first enacted in 1952, as part of the Immigration and Nationality Act ("INA"), see Pub. L. No. 82-414, 66 Stat. 229 at § 276, and is thus the relevant statutory framework here, defendant attempts to tie the legislative history of the 1920s to the INA's 1952 passage. (See Dkt. 31, Reply [ ] at 7-10). Defendant provides no authority or basis for the court to evaluate the 1952 statute solely on the basis of the legislative history relating to the Undesirable Aliens Act of 1929. (See, generally, Dkt. 25, Motion); (Dkt. 31, Reply [ ]). Further, with respect to the passage of the operative statute in 1952, defendant fails to provide any specific evidence establishing that an "invidious discriminatory purpose was a motivating factor" in its enactment.

(See, generally, id.); see, e.g., United States v. Rios-Montano, 2020 WL 7226441, *5-*6 (S.D. Cal. 2020) (defendant "failed to provide any legislative history or other evidence suggestive of the motives of the [relevant] Congress" where he relied solely on the "lack of Congressional disavowal of the discriminatory purposes of the previous version" of a statute). In short, defendant has failed to put forth sufficient evidence establishing that racial discrimination was a motivating factor in the enactment of § 1326, and his Equal Protection challenge is accordingly denied.[2] See Arlington Heights, 429 U.S. at 270-71, 97 S.Ct. at 566 ("Respondents simply failed to carry their burden of proving that discriminatory purpose was a motivating factor[.] This conclusion ends the constitutional inquiry."); see, e.g., Rios-Montano, 2020 WL 7226441, at *8 (denying similar constitutional challenge to § 1325 once defendant failed to meet "his burden of showing that Congress acted with a racially discriminatory motive" under Arlington Heights).

**This Order is not intended for publication. Nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT defendant's Motion to Dismiss **(Document No. 25)** is **denied**.

Dated this 5th day of January, 2021.

/s/
Fernando M. Olguin
United States District Judge

---

[2] In light of the court's conclusion, it is unnecessary to address defendant's disproportionate impact argument. Cf. Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040, 2049 (1976) ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule that racial classifications are to be subjected to the strictest scrutiny[.]") (citation omitted)

2020 WL 7318124
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

UNITED STATES of America, Plaintiff,

v.

Marcos GALLEGOS-APARICIO, Defendant.

Case No.: 19-CR-2637-GPC

|

Signed 12/10/2020

|

Filed 12/11/2020

**Attorneys and Law Firms**

Jill S. Streja, Office of the United States Attorney, San Diego, CA, for Plaintiff.

Martha McNab Hall, DiIorio and Hall, San Diego, CA, for Defendant.

### ORDER DENYING MOTION TO DISMISS INDICTMENT UNDER THE EQUAL PROTECTION CLAUSE

**[ECF No. 57.]**

Gonzalo P. Curiel, United States District Judge

**\*1** Pending before the Court is Defendant Marcos Gallegos-Aparicio's motion to dismiss the Superseding Indictment on the basis that 8 U.S.C. § 1325 violates the equal protection component of the Fifth Amendment due process clause under the test set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). ECF No. 57. For the reasons that follow, the Court DENIES the motion to dismiss.

**I. Procedural History**

On July 12, 2019, an Indictment was filed charging Defendant with Attempted Unlawful Entry by an Alien, a felony, in violation of 8 U.S.C. § 1325(a)(1). The Indictment alleges that Defendant knowingly and intentionally attempted to enter the United States with the purpose of entering the United States at a time and place other than as designated by immigration officers in violation of 8 U.S.C. § 1325(a)(1). ECF No. 18. On October 14, 2020, Mr. Gallegos-Aparicio filed a motion to dismiss the Indictment against him. ECF No. 57. The motion is nearly identical to that filed by the defendant in *United States v. Rios-Montano*, 19CR2123-GPC, ECF No. 70. The Government's opposition here is also nearly the same as the opposition filed in that case. ECF No. 58; 19CR2123-GPC, ECF No. 71. On December 8, 2020, the Court ruled on the *Rios-Montano* motion to dismiss in a 14-page order which addresses the salient points in the arguments raised in the instant matter. *United States v. Rios-Montano*, No. 19CR2123-GPC, 2020 WL 7226441 (S.D. Cal. Dec. 8, 2020). Mr. Gallegos-Aparicio asserts that Section 1325 is unconstitutional under *Arlington Heights*, 429 U.S. 252 (1977), because its precursor, the illegal entry statute, was enacted in 1929 with a discriminatory purpose and has a disparate impact against Mexicans and other Latinx individuals in violation of the equal protection component of the Fifth Amendment. ECF No. 57. On October 29, 2020, the Government filed a response in opposition. ECF No. 58. On November 5, 2020, Mr. Gallegos-Aparicio filed a reply. ECF No. 59. On November 12, 2020, the Court held a hearing on the motion to dismiss. ECF No. 60.

For the following reasons, and considering the applicable law and the Parties' arguments, the Court **DENIES** Defendant's motion.

**II. Analysis**

**A. *Arlington Heights* applies to Section 1325.**
The Court first must determine whether the discriminatory intent test outlined in *Arlington Heights* applies to a criminal immigration law such as Section 1325. "[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976) (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954)). An equal protection violation need not appear on the face of the statute; rather, a litigant may show the challenged law was enacted with an "invidious discriminatory purpose [which] may often be inferred from the totality of the relevant facts." *Id.* at 241–42.

The Court finds that 📎 Section 1325 must be reviewed under the *Arlington Heights* framework to determine whether it denies Mr. Gallegos-Aparicio equal protection of the laws. *See Rios-Montano*, 2020 WL 7226441, at *1–2.

**B. Mr. Gallegos-Aparicio has not met his burden under *Arlington Heights*.**

1. *The Court must consider the Congressional motivation underlying the enactment of* 📎 *Section 1325, the statute which Mr. Gallegos-Aparicio is charged with violating.*

**\*2** *Arlington Heights* states that the "sensitive inquiry" of "[d]etermining whether invidious discriminatory purpose was a motivating factor" for the legislative enactment requires looking to the disparate impact of the official action, "[t]he historical background of the decision"; "[t]he specific sequence of events leading up to the challenged decision"; "[d]epartures from the normal procedural sequence" "[s]ubstantive departures ..., particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"; and "[t]he legislative or administrative history ..., especially when there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Arlington Heights*, 429 U.S. at 266–68. As a threshold matter, this Court must determine which Congress's intent is subject to review. Mr. Gallegos-Aparicio argues that the Court should look to the initial enactment of the statute criminalizing unlawful re-entry, which occurred in 1929. The Government contends that the Court must look to the provision Mr. Gallegos-Aparicio is actually charged with violating— Section 1325(a)(1), enacted in its current form in 1990.

In 1929, Congress enacted the Undesirable Aliens Act, which provided that "[a]ny alien who hereafter enters the United States at any time or place other than as designated by immigration officials or eludes examination or inspection by immigration officials ... shall be guilty of a misdemeanor." Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 2. Section 1325 was enacted in its current form in the Immigration Act of 1990, criminalizing attempted unlawful entry in addition to unlawful entry. Immigration Act of 1990, Pub. L. No. 101-649, § 543(b)(2), 104 Stat. 5059 (codified as amended 📎 8 U.S.C. § 1325(a)(1)).

*Arlington Heights* directs the Court to look at the motivation behind the official action being challenged. *See Arlington Heights*, 429 U.S. at 265–67 (describing intent analysis in terms of "the challenged decision"). The challenged decision in this case is the decision to criminalize the conduct Mr. Gallegos-Aparicio is charged with committing—attempting unlawful entry. This means that the Court must seek to discern the intent of the Congress that enacted that provision of 📎 Section 1325, rather than the intent of previous Congresses.

Mr. Gallegos-Aparicio's reliance on *Ramos v. Louisiana* and *Espinoza v. Montana Department of Revenue* is unavailing. These cases certainly support the contention that subsequent enactments of a statute do not erase its historical context. But *Ramos* and *Espinoza*, neither of which involved an equal protection challenge, did not hold that the discriminatory motivations of a previous legislature are determinative of the outcome of an *Arlington Heights* analysis of a law enacted by a subsequent legislature. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1401 (2020); *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2258–59 (2020). Crucially, despite the well-documented discriminatory history of the provisions at issue in both cases, neither *Ramos* nor *Espinoza* found that the currently operative provisions had been enacted with discriminatory intent, as is required to find an equal protection violation under *Arlington Heights*. *See Ramos*, 140 S. Ct. at 1401 n.44 (noting dissent's argument that "Louisiana and Oregon eventually recodified their nonunanimous jury laws in new proceedings untainted by racism," and disagreeing with the import, but not the accuracy, of that claim); *Espinoza*, 140 S. Ct. at 2259 (noting, and not questioning, Montana's argument that it re-adopted the no-aid provision in the 1970s "for reasons unrelated to anti-Catholic bigotry"). Rather, these decisions confirm that the historical context of legislative enactments are relevant, a point already reflected in the *Arlington Heights* framework.

**\*3** In some situations, the legislative history of past enactments may be highly probative of the motivations of the legislators who enacted the current law, but the Court cannot automatically impute these past motivations to the current law and forgo analysis of the enacting legislature required by *Arlington Heights*. *Cf. Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018) ("[W]e have never suggested that past discrimination flips the evidentiary burden [of the intent test]

on its head."). The Court therefore must consider whether Mr. Gallegos-Aparicio has shown that Congress's 1990 enactment of Section 1325 was motivated at least in part by a discriminatory purpose.

2. *Mr. Gallegos-Aparicio has not shown* Section 1325 *was enacted with a racially discriminatory purpose.*
The Court will address the *Arlington Heights* factors in turn to determine whether Mr. Gallegos-Aparicio has shown that "invidious discriminatory purpose was a motivating factor" in the enactment of the current Section 1325. *Arlington Heights*, 429 U.S. at 266.

#### a. Historical background

In his motion to dismiss, Mr. Gallegos-Aparicio describes at length the historical background of the 1929 Undesirable Aliens Act, the precursor for today's provision criminalizing unlawful entry. This information is certainly relevant to the Court's consideration of the historical backdrop against which Section 1325 was adopted. *Cf. Rogers v. Lodge,* 458 U.S. 613, 624–25 (1982) (considering past laws intended to disenfranchise black people as evidence of intent that at-large election system was adopted with a discriminatory purpose); *Democratic Nat'l Comm. v. Hobbs,* 948 F.3d 989, 1039 (9th Cir. 2020) (looking to legislature's "long history of race-based discrimination, disenfranchisement, and voter suppression" in determining law passed in 2016 was motivated by a discriminatory purpose).

This history suggests that at least some members of Congress were motivated to support immigration restrictions at least in part out of a desire to maintain the supposed purity of the white race and prevent racial mixing, and intended the laws to target races they deemed undesirable. The racially discriminatory motives of the legislators who advocated for the original unlawful entry law, which is substantially similar to the provision in force today, as well as the blatant racism that characterized the immigration debate of the early twentieth century more generally, is relevant to the Court's determination of whether the 101st Congress in 1990 adopted the current Section 1325 with a similarly impermissible intent. However, because this historical background is remote in time to the Immigration Act of 1990, its probative value

as to the motivations of the 101st Congress is limited. *See City of Mobile, Ala. v. Bolden,* 446 U.S. 55, 74 (1980).

#### b. Relevant legislative history, sequence of events leading to enactment, and departures from normal practice of decisionmaking

The crux of the *Arlington Heights* intent test is to discern the motive of the government officials that engaged in the challenged action, yet Defendant has failed to provide any legislative history or other evidence suggestive of the motives of the 101st Congress to support his argument. While not specifically referencing the 1929 law or condemning white supremacy or eugenics, the legislative history for the 1990 legislation reveals an about face away from the racist trope that accompanied the enactment of the 1929 immigration law. Ultimately, the question before the Court is whether a law related to one that was stained by white supremacy can ever be cleansed without a formal condemnation of the earlier law. The answer derived from a number of federal court decisions is yes.

**\*4** In *Johnson v. Governor of the State of Florida*, the Eleventh Circuit found that Florida's 1968 re-enactment of a disenfranchisement provision originally adopted in 1868 "eliminated any taint from the allegedly discriminatory 1868 provision." 405 F.3d 1214, 1223 (11th Cir. 2005). In so finding, the court emphasized the lengthy deliberative process preceding the 1968 enactment, during which there was no allegation of racial animus. *Id.; cf. Cotton v. Fordice,* 157 F.3d 388, 392 (5th Cir. 1998) (rejecting argument that a disenfranchisement provision could be invalidated solely on the basis that original version of the provision was adopted with a discriminatory purpose, where provision's challenger "offered no such proof regarding the current version."); Hayden v. Paterson, 594 F.3d 150, 166–67 (2d Cir. 2010).

The thorough deliberative process Congress undertook in 1990, combined with the lack of legislative history addressing Section 1325, underscores the absence of proof of the 101st Congress's discriminatory intent.

While Mr. Gallegos-Aparicio has not cited any part of the legislative history from 1990 which discloses any racial animus in the law against aliens from Latin America, a review of the legislative history reveals a balancing

of valid immigration considerations such as reunifying families, providing support of Central Americans displaced by violence, protecting jobs for those legally in the United States and protecting the safety and health of the community. *See United States v. Rios-Montano*, 2020 WL 7226441, at \*5–6. The Court concludes that the legislative history for the 1990 legislation does not reveal any discriminatory motive and provides no support for Mr. Gallegos-Aparicio's position.

### c. Disparate impact

Although a showing of disparate impact on its own is typically insufficient to show an equal protection violation, "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Davis*, 426 U.S. at 242. Mr. Gallegos-Aparicio contends that Mexicans and other Latin Americans make up the vast majority of individuals apprehended at the border which supports a finding that Section 1325 bears more heavily on Latinx people. The Government does not dispute the statistics cited by Mr. Gallegos-Aparicio, but argues they

are due solely to Mexico's geographic proximity to the United States and that Mr. Gallegos-Aparicio therefore cannot show disparate impact.

Although Latinx people are likely disproportionately affected by Section 1325, the disparate impact alone in this case is not stark enough to show discriminatory motive, given that the disparity is explainable on grounds other than race. *See Arlington Heights*, 429 U.S. at 266. The Court therefore finds that Mr. Gallegos-Aparicio has not met his burden of showing that Congress acted with a racially discriminatory motive in enacting Section 1325.

### III. Conclusion

For the foregoing reasons, Defendant's motion to dismiss the Superseding Indictment under *Arlington Heights* is **DENIED**.

**IT IS SO ORDERED.**

### All Citations

Slip Copy, 2020 WL 7318124

---

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                                            Criminal Action No. 3:20-cr-62

FRANCISCO EDGARDO PALACIOS-ARIAS,
                    Defendant.

## MEMORANDUM ORDER

This matter comes before Court on the defendant's motion to dismiss the indictment

against him. (ECF No. 24.) The defendant, Francisco Edgardo Palacios-Arias, asserts two bases

for relief. First, he argues that he received ineffective assistance of counsel at the removal

hearing that led to his deportation, rendering that proceeding fundamentally unfair and

constitutionally defective.[1] Second, he argues that the illegal reentry statute, 8 U.S.C. § 1326,

"violates the equal protection of the laws under the Fifth Amendment's guarantee of due

process" because a discriminatory purpose motivated Congress's enactment of the statute. (ECF

No. 24, at 1.) Both arguments fail. The Court therefore denies the defendant's motion.

## I. DISCUSSION

### A. *Ineffective Assistance of Counsel*

On September 14, 2017, after a hearing in which the defendant had retained counsel and

testified, an immigration judge ordered the defendant's removal from the United States. (ECF

No. 24-14.) The Board of Immigration Appeals ("BIA") dismissed the defendant's appeal on

February 28, 2018. (ECF No. 24-17.) The defendant did not appeal that dismissal to the Fourth

Circuit.

---

[1] Palacios-Arias's reentry into the United States after that deportation underpins the
indictment at issue.

To collaterally attack the removal order underpinning an illegal reentry violation, a defendant must demonstrate that (1) he has exhausted the administrative remedies available to challenge the order; (2) the deportation proceeding "improperly deprived" the defendant of "the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d). "Because these conditions are listed in the conjunctive, a defendant must show all three in order to prevail." *United States v. Mejia*, 671 F. App'x 161, 161 (4th Cir. 2016).

Here, the defendant argues that the September 2017 hearing "was 'fundamentally unfair' because of [his attorney's] ineffective assistance of counsel." (ECF No. 24, at 8.) He further claims that because of his attorney's ineffectiveness, "the necessary arguments and evidence were not presented to the immigration judge" and an appeal of the BIA's dismissal of his appeal "would have been futile." (*Id.* at 12.) He therefore claims that he did not receive "the opportunity for judicial review." (*Id.*)

The defendant cites no authority to support his argument. Indeed, when presented with the opportunity to create a futility exception to § 1326(d)(2)'s judicial review requirement, courts have refused to do so. For example, in *United States v. Ramirez Mejia*, No. 1:15cr361, 2016 WL 743400, at *6 (E.D. Va. Feb. 23, 2016), *aff'd* 671 F. App'x 161, the court held that a defendant did not lack "the opportunity for judicial review" when the only ground "identifie[d] for his inability to access judicial review [was] futility." *Id.*[2] This Court likewise refuses to create a

---

[2] *See also United States v. Zapata-Cortinas*, 351 F. Supp. 3d 1006, 1024-25 (W.D. Tex. 2018) (rejecting the defendant's futility argument and finding "that Defendant is not excused from satisfying the administrative exhaustion and judicial review requirements in § 1326(d)" (citing *Ramirez Mejia*, 2016 WL 743400, at *5)).

futility exception to § 1326(d)'s judicial review requirement. Accordingly, the defendant cannot collaterally attack the validity of the deportation order underpinning his charges.[3]

### B. *Challenge to the Constitutionality of § 1326*

The defendant also argues that the Court should declare the illegal reentry statute unconstitutional because "the original illegal reentry law was enacted with a discriminatory purpose" in 1929. (ECF No. 24, at 13.)

"'[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of" immigrants. *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)). Indeed, "in matters of immigration and naturalization, 'Congress regularly makes rules that would be unacceptable if applied to citizens.'" *Johnson v. Whitehead*, 647 F.3d 120, 127 (4th Cir. 2011) (quoting *Fiallo*, 430 U.S. at 792). Unsurprisingly then, courts typically apply rational basis review when considering the constitutionality of immigration laws. *Midi v. Holder*, 566 F.3d 132, 137 (4th Cir. 2009) ("Although courts usually subject national-origin classifications to strict scrutiny, when such classifications involve unadmitted aliens in the immigration context, we subject them only to rational basis review.").[4] Thus, the Court must decide whether § 1326 "is, at a minimum,

---

[3] Because the defendant failed to show that he lacked "the opportunity for judicial review," the Court need not address § 1326(d)'s other two prerequisites for collaterally attacking a deportation order.

[4] The defendant claims that because he asserts "a clear race-based" challenge to § 1326 the Court should not apply rational basis review. (ECF No. 33, at 8.) The Court disagrees for two reasons. First, § 1326 classifies people based on citizenship. *See* 8 U.S.C. § 1326 (making it a crime for "any alien" to illegally reenter the United States); *id.* § 1101 (defining "alien" as "any person not a citizen or national of the United States"). Second, courts generally apply rational basis review to immigration laws, even if the law employs classifications that would receive stricter scrutiny in other contexts. *See Midi*, 566 F.3d at 137.

rationally related to legitimate governmental goals." *Wilkins v. Gaddy*, 734 F.3d 344, 348 (4th Cir. 2013).

The government undoubtedly has a legitimate interest in deterring illegal reentry into the United States. Doing so increases the likelihood of compliance with deportation orders and promotes respect for the country's legal immigration process. Moreover, the illegal reentry statute rationally relates to that interest by sanctioning those who disregard a previous deportation order. Thus, § 1326 satisfies rational basis review.

The Supreme Court has held, however, that "[w]hen there is a proof that a discriminatory purpose" motivated Congress to pass the law, a court should subject the law to heightened scrutiny. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).[5] To determine whether a discriminatory purpose motivated Congress to pass a law, a court examines numerous factors, including but not limited to, the law's impact, its historical background, "[t]he specific sequence of events leading up to the challenged decision," the legislature's substantive departures from the normal lawmaking process, and legislative or

---

[5] The government argues that *Arlington Heights* does not apply here because "it is 'not the judicial role . . . to probe and test the justifications for' "congressional immigration policy." (ECF No. 30, at 19 (quoting *Fiallo*, 430 U.S. at 799).) Instead, it urges the Court to end its analysis after finding that § 1326 rationally relates to a legitimate government interest. The Court finds that argument persuasive.

> For more than a century, [the Supreme Court] has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.' . . . Because decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature of the Executive.

*Trump v. Hawaii*, 138 S. Ct. 2392, 2418-19 (2018) (quoting *Fiallo v. Bell*, 430 U.S. at 792; *Matthews v. Diaz*, 426 U.S. 67, 81 (1976)).

The Court need not decide this question, however, because the defendant's challenge to § 1326's constitutionality fails even if the Court applies *Arlington Heights*'s analytical framework.

administrative history. *Id.* at 266-68. If a law's challenger produces evidence that a discriminatory purpose motivated a law's passage, then the burden shifts to the government to prove that the legislature would have passed the law "even had the impermissible purpose not been considered." *Id.* at 270 n.21.

The defendant argues that a "close examination of the political context underlying the criminalization of illegal reentry in 1929 reveals a disturbing truth: that racism and eugenics were not only a 'motivating factor' in the legislature's passage of [the Undesirable Aliens Act of 1929]. They were the primary factor." (ECF No. 24, at 16 (quoting *Arlington Heights*, 429 U.S. at 265).) At the hearing on the motion, the defendant's expert summarized parts of the law's legislative and political history. She also detailed the long history of anti-immigrant policies in the United States and the connection between economic downturns and restrictive immigration policies.

That history, however, did little to explain why Congress passed the Immigration and Nationality Act of 1952 ("INA"), the law that replaced the Undesirable Aliens Act of 1929 and that the defendant allegedly violated. *See* Pub. L. No. 82-414, 66 Stat. 229 (codified as amended at 8 U.S.C. § 1326). To challenge the INA using *Arlington Heights*, the defendant must provide evidence that a discriminatory purpose motivated Congress to pass that law. He has not done so here.

The defendant says the Court should examine the discriminatory purpose that he alleges motivated Congress to pass the Undesirable Aliens Act of 1929. He contends that "[t]he government's argument that subsequent reenactments of the law have dissipated the clear discriminatory origins of the [Undesirable Aliens Act of 1929] . . . fails" because "[l]ater enactments of *racially* discriminatory laws and policies do not save them from an Equal

5

Protection challenge."[6] (ECF No. 33, at 9 (emphasis added).) The cases cited by the defendant, however, do not support the proposition the defendant says they do.[7]

Even assuming, however, that the Court can consider the discriminatory purpose that the defendant alleges motivated Congress to pass the Undesirable Aliens Act of 1929, this evidence has only marginal relevance to the defendant's challenge to the INA, passed by Congress twenty-

---

[6] *But see McClesky v. Kemp*, 481 U.S. 279, 298 n.20 (1987) ("[T]he 'historical background of the decision is one evidentiary source' for proof of intentional discrimination. . . . But unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value. . . . Although the history of racial discrimination in this country is undeniable, we cannot accept official actions taken long ago as evidence of current intent." (citations omitted)); *see also Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) ("The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination. '[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful.'" (alteration in original) (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980)); *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 215-16 (1983) (refusing to presume that California enacted one law "for the same purposes" as other laws with "a common heritage" because "these other state laws are not before the Court . . . and their pedigree do not taint other parts of the" law at issue).

[7] In support of this claim, the defendant cites two racial discrimination cases in his brief. But, as stated above, this case involves classification based on citizenship, not race. Moreover, neither case establishes that the Court should consider a past law when evaluating whether a subsequent reenactment violates the Equal Protection Clause.

The defendant first cites *United States v. Fordice*, 505 U.S. 717 (1992), in which the Court decided whether Mississippi had complied with the school desegregation order the Court announced in *Brown v. Board of Education*, 349 U.S. 294 (1955) (*Brown II*). The Court did not consult Mississippi's history of segregation to determine whether the state's public university system violated the Equal Protection Clause. Instead, it consulted this history to determine whether the state had satisfactorily complied with *Brown II*. *Id.* at 728-29.

The defendant next cites *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), in which the Court held that Louisiana's and Oregon's laws allowing nonunanimous jury convictions violated the Sixth Amendment. *Id.* at 1394, 1408. The majority "acknowledg[ed] the racist history" of these laws, *id.* at 1401 n.44, but, as Justice Sotomayor noted, Ramos did "not bring an equal protection challenge." *Id.* at 1410 (Sotomayor, J., concurring).

Finally, during argument, the defendant cited *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020), in which the Court reversed a Montana Supreme Court decision that struck down a state scholarship program that excluded students attending religiously affiliated private schools. *Id.* at 2263. The Court based its decision on the Free Exercise clause and did not address whether the state constitutional provision "violate[d] the Equal Protection Clause . . . ." *Id.* at 2265 n.5.

three years later. Just as "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one," the views of an *earlier* Congress "form a hazardous basis for inferring the intent of" a later one. *United States v. Price*, 361 U.S. 304, 313 (1960).[8] The defendant offers no other evidence—beyond the discriminatory purpose that allegedly motivated Congress's passage of the 1929 law—to support his challenge. Because the defendant has not offered adequate proof that a discriminatory purpose motivated Congress to pass the INA, the Court does not find that it should apply heightened review. *See Arlington Heights*, 429 U.S. at 265-66.

For the sake of thoroughness, even if the Court agreed with the defendant and applied the heightened scrutiny that *Arlington Heights* calls for, the defendant's challenge to § 1326 would still fail. Under the *Arlington Heights* framework, a law survives a constitutional challenge if the government can prove that Congress would have passed the law—here, the INA—even if Congress had not considered "the impermissible purpose." *Id.* at 270 n.21.[9] Here, the defendant offers scant evidence that an impermissible purpose motivated Congress's passage of the INA; he largely confines his evidence and argument to the INA's much older predecessor. And according to the government *and the defendant's own expert*, Congress passed the INA to

---

[8] Notably, the 70th Congress, which passed the Undesirable Aliens Act of 1929, shared only twenty-one members with the 82nd Congress, which passed the INA in 1952. This amounts to a more than 96% turnover, making any inference even more "hazardous." *See 70th Congress (1927–1929): Congress Profiles*, History, Art & Archives: United States House of Representatives, https://history.house.gov/Congressional-Overview/Profiles/70th/ (last visited on Oct. 7, 2020); *82nd Congress (1951–1953): Congress Profiles*, History, Art & Archives: United States House of Representatives, https://history.house.gov/Congressional-Overview/Profiles/82nd/ (last visited on Oct. 7, 2020).

[9] The defendant improperly frames this question as: Would Congress have passed the Undesirable Aliens Act of 1929 if it had not considered the discriminatory purpose? Instead, the Court asks whether Congress would have passed *the INA*, the law that the defendant allegedly violated, had Congress not considered the alleged discriminatory purpose.

"deter[] illegal reentry" *and* to protect American workers and the interests of those working legally in the United States. (ECF No. 30, at 17.) Indeed, the defendant's expert acknowledged that Congress regularly passed restrictive immigration laws, including the INA, during economic downturns. The Court cannot ignore this economic motivation for passing the INA. Thus, even under *Arlington Heights*'s heightened standard of review, the defendant's challenge to the constitutionality of § 1362 would fail.

### III. <u>CONCLUSION</u>

For the reasons set forth above, the Court DENIES the defendant's motion to dismiss the indictment against him. (ECF No. 24.)

It is so ORDERED.

Let the Clerk send a copy of this Order to all counsel of record.

Date: 13 October 2020
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

2020 WL 7226441
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

UNITED STATES of America, Plaintiff,

v.

Bruno RIOS-MONTANO, Defendant.

Case No.: 19-CR-2123-GPC

|

Signed 12/07/2020

|

Filed 12/08/2020

**Attorneys and Law Firms**

Shital Thakkar, United States Attorney's Office, San Diego, CA, for Plaintiff.

Bridget Kennedy, Federal Defenders of San Diego, San Diego, CA, for Defendant.

### ORDER DENYING MOTION TO DISMISS INDICTMENT UNDER THE EQUAL PROTECTION CLAUSE

**[ECF No. 70.]**

Gonzalo P. Curiel, United States District Judge

**\*1** Pending before the Court is Defendant Bruno Rios-Montano's motion to dismiss the Superseding Indictment on the basis that 8 U.S.C. § 1325 violates the equal protection component of the Fifth Amendment due process clause under the test set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). ECF No. 70. For the reasons that follow, the Court DENIES the motion to dismiss.

### I. Procedural History

On September 24, 2019, the Government filed the Superseding Indictment which charges that Mr. Rios-Montano, being an alien, knowingly and intentionally attempted to enter the United States with the purpose of entering the United States at a time and place other than as designated by immigration officers in violation of 8 U.S.C. § 1325(a)(1). ECF No. 29. On August 5, 2020, Mr. Rios-Montano filed a motion to dismiss the Superseding Indictment against him. ECF No. 70. Mr. Rios-Montano asserts that Section 1325 is unconstitutional under *Arlington Heights*, 429 U.S. 252 (1977), because the illegal entry statute was enacted with a discriminatory purpose and has a disparate impact against Mexicans and other Latinx individuals in violation of the equal protection component of the Fifth Amendment. *Id.* The motion to dismiss also requested that, in the event that the Government submitted evidence to rebut Mr. Rios-Montano's evidence of discriminatory intent and disparate impact, the Court hold an evidentiary hearing to hear evidence on the *Arlington Heights* factors. *Id.* at 24. On August 13, 2020, the Government filed a response in opposition. ECF No. 71. On August 26, 2020, Mr. Rios-Montano filed a reply. ECF No. 73. On September 24, the Court held a telephonic status hearing and requested further briefing on the evidentiary issues. ECF No. 74. Following supplemental briefing, the Court determined an evidentiary hearing was not needed. ECF Nos. 75, 76, 78.

On October 29, 2020, the Court held a hearing on the motion to dismiss. ECF No. 79. Following the hearing, the Court permitted Mr. Rios-Montano to submit further briefing on the legislative history of Section 1325. *Id.* On November 12, 2020, Mr. Rios-Montano filed additional briefing on the legislative history. ECF No. 80. On November 25, 2020, the Government filed a response. ECF No. 81. Having considered the briefing and argument of counsel, the Court concludes that 8 U.S.C. § 1325 was not enacted in 1990 with a discriminatory purpose and does not violate equal protection. While the precursor illegal entry statute enacted in 1929 was enacted with discriminatory intent, the taint from the 1929 statute had dissipated by 1990 and there is no evidence that the 1990 Congress entertained any discriminatory purpose.

### II. Analysis

#### A. *Arlington Heights* applies to Section 1325.

The Court first must determine whether the discriminatory intent test outlined in *Arlington Heights* applies to a criminal immigration law such as Section 1325. "[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups."

*Washington v. Davis*, 426 U.S. 229, 239 (1976) (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954)). An equal protection violation need not appear on the face of the statute; rather, a litigant may show the challenged law was enacted with "an invidious discriminatory purpose [which] may often be inferred from the totality of the relevant facts." *Id.* at 241–42. In *Arlington Heights*, the Supreme Court articulated a non-exhaustive list of factors that courts should look to in order to determine whether a discriminatory purpose was a motivating factor for a governmental decision, noting that such analysis "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 265–68. Absent proof of a discriminatory purpose, courts apply a rational basis standard of review. *See id.* at 265–66; *United States v. Dumas*, 64 F.3d 1427, 1430–31 (9th Cir. 1995) (applying rational basis upon finding no discriminatory motivation for statute). But if a discriminatory purpose is found to be a motivating factor for the government's decision, a court must apply strict scrutiny, as it would to a law involving a facial classification on the basis of race. *See Hunt v. Cromartie*, 526 U.S. 541, 546 (1999).

**\*2** The Government contends that Section 1325 cannot be found unconstitutional under the *Arlington Heights* standard of review because Congressional decisions relating to immigration affairs are subject to the limited standard of review outlined in *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972), or, at most, the rational basis standard of review. Mr. Rios-Montano responds that Congress's plenary power over immigration does not prevent the Court from considering whether Section 1325 was enacted with racially discriminatory animus in violation of the Fifth Amendment's equal protection component.

As a preliminary matter, the Court notes that all criminal defendants are entitled to the Constitutional guarantee of due process of law secured by the Fifth Amendment, regardless of immigration status. *See Wong Wing v. United States*, 163 U.S. 228, 238 (1896) ("[E]ven aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law."); *United States v. Mendoza-Lopez*, 481 U.S. 828, 837 (1987) (noting that Section 1326 must "comport with

the constitutional requirement of due process"). Further, the federal government's plenary power over immigration matters does not provide it license to enact racially discriminatory statutes in violation of the equal protection guarantee of the Fifth Amendment. The Ninth Circuit, as well as a plurality of the Supreme Court, recently declined to apply the highly deferential standard of review advocated by the Government to an equal protection challenge of immigration decisions by the executive. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915 (2020); *Ramos v. Wolf*, 975 F.3d 872, 896 (9th Cir. 2020) (hereinafter *Wolf*). In *Ramos v. Wolf* and the Ninth Circuit decision in *Regents*, the Ninth Circuit applied *Arlington Heights* rather than a more deferential standard of review to an equal protection challenge of the executive branch's repeal of immigration enforcement policies, given considerations that included "the physical location of the plaintiffs within the geographic United States, the lack of a national security justification for the challenged government action, and the nature of the constitutional claim raised." *Wolf*, 975 F.3d at 896 (quoting *Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 520 (9th Cir. 2018), *rev'd in part, vacated in part sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020)). The Supreme Court plurality opinion in *Regents* likewise applied the *Arlington Heights* framework to the repeal of the Deferred Action for Childhood Arrivals ("DACA") program by the Acting Secretary of the Department of Homeland Security, [1] as did Justice Sotomayor's concurring opinion. *Regents*, 140 S.Ct. at 1916; *id.* at 1918 (Sotomayor, J., concurring). The fact that Mr. Rios-Montano challenges a criminal law, rather than a policy dictating immigration privileges, further confirms that his equal protection challenge is reviewable under more than the limited standards offered by the Government.

That previous decisions have applied *Arlington Heights* to executive immigration decisions, rather than Congressional ones, is of no consequence. The Government has provided no convincing justification for why the President, in executing the immigration laws enacted by Congress through administrative action, would be subject to Constitutional equal protection constraints that Congress is free to ignore. Further, it would be inconceivable—and without basis in law —to find that courts are unable to review a criminal law that, on its face, targets a particular racial group merely because the offense relates to immigration—for example,

if Section 1325 explicitly prescribed harsher penalties for immigrants of Latin American descent. The Supreme Court has clearly stated that both facially discriminatory laws and facially neutral laws enacted with discriminatory animus may violate equal protection. *E.g.*, *Washington, 426 U.S. at 241.* A criminal immigration statute passed by Congress is not insulated from scrutiny because the defendant seeks to prove the equal protection violation through a racially discriminatory Congressional motive rather than a facial classification on the basis of race. Accordingly, the Court finds that Section 1325 must be reviewed under the *Arlington Heights* framework to determine whether it denies Mr. Rios-Montano equal protection of the laws.

**B. Mr. Rios-Montano has not met his burden under *Arlington Heights*.**

1. *The Court must consider the Congressional motivation underlying the enactment of* Section 1325, *the statute which Mr. Rios-Montano is charged with violating.*

**\*3** Having determined that Mr. Rios-Montano is entitled to challenge the Superseding Indictment under *Arlington Heights*, the Court must turn to the task of discerning Congressional intent. *Arlington Heights* states that the "sensitive inquiry" of "[d]etermining whether invidious discriminatory purpose was a motivating factor" for the legislative enactment requires looking to the disparate impact of the official action, "[t]he historical background of the decision"; "[t]he specific sequence of events leading up to the challenged decision"; "[d]epartures from the normal procedural sequence" "[s]ubstantive departures ..., particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"; and "[t]he legislative or administrative history ..., especially when there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Arlington Heights, 429 U.S. at 266–68.* The threshold question for this Court, however, is which Congress's intent is subject to review. Mr. Rios-Montano argues that the Court should look to the initial enactment of the statute criminalizing unlawful entry, which occurred in 1929. The Government contends that the Court must look to the provision Mr. Rios-Montano is actually charged with violating— Section 1325(a)(1), enacted in its current form in 1990.

In 1929, Congress enacted the Undesirable Aliens Act, which provided that "[a]ny alien who hereafter enters the United States at any time or place other than as designated by immigration officials or eludes examination or inspection by immigration officials ... shall be guilty of a misdemeanor." Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 2. The Immigration and Nationality Act of 1952, the first comprehensive immigration law, recodified existing provisions under title 8 of the U.S. Code and continued to criminalize unlawful entry. Immigration and Nationality Act of 1952, Pub. L. No. 82-414, § 275, 66 Stat. 229. Section 1325 was enacted in its current form in the Immigration Act of 1990, criminalizing attempted unlawful entry in addition to unlawful entry. Immigration Act of 1990, Pub. L. No. 101-649, § 543(b)(2), 104 Stat. 5059 (codified as amended 8 U.S.C. § 1325(a)(1)).

*Arlington Heights* permits consideration of historical circumstances. Mr. Rios-Montano has presented legislative history for the 1929 law and the declaration of a historian, Dr. Kelly Lytle Hernandez, supporting his contention that members of the 1929 Congress sought to criminalize unlawful entry, at least in part, because of their endorsement of eugenics and opposition to the "Mexican race". ECF No. 70 at 7–18; ECF No. 70-1, Ex. A-L. This information is certainly relevant to the Court's consideration of the historical backdrop against which Section 1325 was adopted. *Cf. Rogers v. Lodge, 458 U.S. 613, 624–25 (1982)* (considering past laws intended to disenfranchise black people as evidence of intent that at-large election system was adopted with a discriminatory purpose); *Democratic Nat'l Comm. v. Hobbs, 948 F.3d 989, 1039 (9th Cir. 2020)* (looking to legislature's "long history of race-based discrimination, disenfranchisement, and voter suppression" in determining law passed in 2016 was motivated by a discriminatory purpose). However, *Arlington Heights* directs the Court to look at the motivation behind the official action being challenged. *See Arlington Heights, 429 U.S. at 265–67* (describing intent analysis in terms of "the challenged decision"). The challenged decision in this case is the decision to criminalize the conduct Mr. Rios-Montano is charged with committing—attempting unlawful entry.[2] This means that the Court must seek to discern the intent of the Congress that enacted that provision of Section 1325, rather than the intent of previous Congresses.

**\*4** Mr. Rios-Montano's reliance on *Ramos v. Louisiana* and *Espinoza v. Montana Department of Revenue* is unavailing. These cases certainly support the contention that subsequent enactments of a statute do not erase its historical context. But *Ramos* and *Espinoza*, neither of which involved an equal protection challenge, did not hold that the discriminatory motivations of a previous legislature are determinative of the outcome of an *Arlington Heights* analysis of a law enacted by a subsequent legislature. *See* Ramos v. Louisiana, 140 S. Ct. 1390, 1401 (2020); Espinoza v. Montana Dep't of Revenue, 140 S. Ct. 2246, 2258–59 (2020). Crucially, despite the well-documented discriminatory history of the provisions at issue in both cases, neither *Ramos* nor *Espinoza* found that the currently operative provisions had been enacted with discriminatory intent, as is required to find an equal protection violation under *Arlington Heights*. *See* Ramos, 140 S. Ct. at 1401 n.44 (noting dissent's argument that "Louisiana and Oregon eventually recodified their nonunanimous jury laws in new proceedings untainted by racism," and disagreeing with the import, but not the accuracy, of that claim); Espinoza, 140 S. Ct. at 2259 (noting, and not questioning, Montana's argument that it re-adopted the no-aid provision in the 1970s "for reasons unrelated to anti-Catholic bigotry"). Rather, these decisions confirm that the historical context of legislative enactments are relevant, a point already reflected in the *Arlington Heights* framework.

In some situations, the legislative history of past enactments may be highly probative of the motivations of the legislators who enacted the current law, but the Court cannot automatically impute these past motivations to the current law and forgo analysis of the enacting legislature required by *Arlington Heights*. *Cf.* Abbott v. Perez, 138 S. Ct. 2305, 2325 (2018) ("[W]e have never suggested that past discrimination flips the evidentiary burden [of the intent test] on its head."). The Court therefore must consider whether Mr. Rios-Montano has shown that Congress's 1990 enactment of Section 1325 was motivated at least in part by a discriminatory purpose.

> 2. *Mr. Rios-Montano has not shown* Section 1325 *was enacted with a racially discriminatory purpose.*

The Court will address the *Arlington Heights* factors in turn to determine whether Mr. Rios-Montano has shown that "invidious discriminatory purpose was a motivating factor" in the enactment of the current Section 1325. Arlington Heights, 429 U.S. at 266.

### a. Historical background

In his initial motion to dismiss, Mr. Rios-Montano describes at length the historical background of the 1929 Undesirable Aliens Act, the precursor for today's provision criminalizing unlawful entry. He points to comments made on the floor of Congress that show several legislators who were involved in the passage of the 1929 Act viewed it as a means of fighting against the "hordes" of Mexicans, as well as to the endorsement of eugenics among some legislators in the context of the broader immigration debate. ECF No. 70-1, Ex. A ("Hernandez Decl.") at 5–7, 9; Ex. B (*Eugenical Aspects of Deportation: Hearing No. 70.1.4 Before the H. Comm. on Immigration and Naturalization*, 70th Cong. (1928) (statement of Harry H. Laughlin)); Ex. C (70 Cong. Rec. 3614 (Feb. 16, 1929)). Some legislators unabashedly endorsed white supremacy and directly tied the goal of preventing long-term immigration of Mexicans to racial panic. ECF No. 70 at 12–13; ECF No. 70-1, Ex. C (70 Cong. Rec. 3614 (Feb. 16, 1929)); Ex. F (69 Cong. Rec. 2462 (1928)); Ex. G (*Deportation: Hearing on Proposed Deportation Act of 1926 Before the H. Comm. on Immigration and Naturalization*, 69th Cong. (1926) (statements of Hon. Robe Carl White, Hon. Harry E. Hull, W. H. Wagner)). This history suggests that at least some members of Congress were motivated to support immigration restrictions at least in part out of a desire to maintain the supposed purity of the white race and prevent racial mixing, and intended the laws to target races they deemed undesirable. The fact that countries in the Western Hemisphere were not subject to numerical quotas at the time, which Dr. Lytle Hernandez explains was related to pressure from agribusiness interests that relied on short-term Mexican labor, does not negate the significant historical record reflecting racial animus. Hernandez Decl. at 7. As the intent test recognizes, the fact that race was not the singular focus of lawmakers does not mean they had no impermissible motive at all. *Cf.* Arlington Heights, 429 U.S. at 255 ("Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern."). The racially discriminatory motives of the legislators who advocated for the original unlawful entry law, which is substantially similar to the provision in force today, as well as the blatant racism that characterized the immigration debate of the early

twentieth century more generally, is relevant to the Court's determination of whether the 101st Congress adopted the current Section 1325 with a similarly impermissible intent. However, because this historical background is remote in time to the Immigration Act of 1990, its probative value as to the motivations of the 101st Congress is limited. *See City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion).

### b. Relevant legislative history, sequence of events leading to enactment, and departures from normal practice of decisionmaking

**\*5** Mr. Rios-Montano points to the absence of legislative history relating to Section 1325's alterations in the 1990 Act as evidence that members of the 101st Congress did not recognize or address the provision's racially motivated past, and therefore that the racially discriminatory intent of the 70th Congress remains embedded in the current version of Section 1325. ECF No. 80 at 5. Mr. Rios-Montano reasons that because the legislative history indicates that the 101st Congress grappled with and corrected other discriminatory provisions in the immigration law, Congress was able to "reconcile an uncomfortable past with new legislation" but did not do so with respect to Section 1325. *Id.* The Government maintains its position that the legislative history evinces no discriminatory motive on the part of the 101st Congress. ECF No. 81 at 2–3.

The crux of the *Arlington Heights* intent test is to discern the motive of the government officials that engaged in the challenged action, yet Mr. Rios-Montano has failed to provide any legislative or other evidence suggestive of the motives of the 101st Congress to support Mr. Rios-Montano's burden to show a discriminatory motive. Given this failure, Mr. Rios-Montano is left with the assertion that in 1990, the "legislators entirely failed to recognize" the "racist purpose" of the 1929 statute. ECF No. 80 at 5. While not specifically referencing the 1929 law or condemning white supremacy or eugenics, the legislative history for the 1990 legislation reveals a 180-degree turn away from the racist tropes that accompanied the enactment of the 1929 immigration law. Ultimately, the question before the Court is whether a law related to one that was stained by white supremacy can ever be cleansed without a formal condemnation of the earlier law. The answer is it depends on the surrounding circumstances,

including the passage of time, the pronouncements made with respect to the new law and the nature and purpose of the law.

In considering the conference report on the Immigration Act of 1990, Congressman Bruce Morrison, chairman of the of the House Immigration Subcommittee and House author of the Immigration Act of 1990, described the legislation as historic legislation that "reforms our legal immigration system in ways more extensive and more broad than any legislation this Congress has ever considered before." 136 Cong. Rec. 36839 (Oct. 27, 1990). Congressman Morrison observed that the law was strong on the improvement of family unification and brought families together. *Id.* He also observed that under the legislation those who fled the violence and death in El Salvador would be given temporary protected status. *Id.* Congresswoman Nancy Pelosi expressed her support for the legislation, describing herself as one who believes that immigration is good for our country. 136 Cong. Rec. 36843–44.

At the same time, as to the exclusion of undocumented individuals, Congressman Hamilton Fish IV emphasized that the changes the legislation brought about would:

> **\*6** "not disturb the basic reasons for which we have always, and will always, exclude aliens: For cases where aliens have criminal records, when they are public health risks, when they violate drug laws, when they are likely to become economic burdens on the country, or *when they have previously violated U.S. Immigration laws.* This is a comprehensive reform of exclusions laws which is a rational accommodation of the concerns of everyone —from those of the administration to those of civil libertarians." 136 Cong. Rec. 36844 (emphasis added).

The legislation enjoyed the support of Congressmen Kika de la Garza, Bill Richardson, Edward Roybal and Esteban Torres whose statements recognize the importance of immigration and diversity in the United States. 136 Cong. Rec. 36845–46. Further, although not dispositive, the fact that organizations such as the Mexican American Legal Defense and Education Fund (MALDEF) and the American Civil Liberties Union (ACLU) supported the law further weakens Mr. Rios-Montano's argument that congressional silence on the changes to Section 1325 should be construed as evidence of an impermissible motive. 136 Cong. Rec. 36846–47.

According to Mr. Rios-Montano the change in law that created the offense of attempted illegal entry was "hardly the

focus of the 1990 law" and there is no specific reference in the legislative history to 🔖 § 1325 as to establish an endorsement of the law. Although Mr. Rios-Montano argues that the intent of the prior Congress remains legally operative until a future Congress makes an affirmative contrary showing, other courts that have considered the issue in the context of felon disenfranchisement provisions have rejected this approach. In *Johnson v. Governor of the State of Florida*, the Eleventh Circuit found that Florida's 1968 re-enactment of a disenfranchisement provision originally adopted in 1868 "eliminated any taint from the allegedly discriminatory 1868 provision." 🔖 405 F.3d 1214, 1223 (11th Cir. 2005). In so finding, the court emphasized the lengthy deliberative process preceding the 1968 enactment, during which there was no allegation of racial animus. *Id.* Likewise, the Fifth Circuit in *Cotton v. Fordice* rejected the argument that a disenfranchisement provision could be invalidated solely on the basis that the original version of the provision was adopted with a discriminatory purpose, where the provision's challenger "offered no such proof regarding the current version." 🔖 157 F.3d 388, 392 (5th Cir. 1998). The Second Circuit agreed in *Hayden v. Paterson*, finding that because there had been "substantive amendment to New York's constitutional provision" and because of "the lack of any allegations by plaintiffs of discriminatory intent reasonably contemporaneous with the challenged decision," plaintiffs failed to state a plausible claim of discrimination with respect to the amended provision. 🔖 594 F.3d 150, 166–67 (2d Cir. 2010). Like the challengers to the amended disenfranchisement provisions at issue in these cases, Mr. Rios-Montano would have the lack of Congressional disavowal of the discriminatory purposes of the previous version render the current version unconstitutional. However, the thorough deliberative process Congress undertook in 1990, combined with the lack of legislative history addressing 🔖 Section 1325, underscores the absence of proof of the 101st Congress's discriminatory intent. [3]

**\*7** While Mr. Rios-Montano has not cited any part of the legislative history which discloses any racial animus in the law against aliens from Latin America, a review of the legislative history reveals a balancing of valid immigration considerations such as reunifying families, providing support of Central Americans displaced by violence, protecting jobs for those legally in the United States and protecting the safety and health of the community. The Court concludes that the legislative history for the 1990 legislation does not reveal any

discriminatory motive and provides no support for Mr. Rios-Montano's position.

### c. Disparate impact

Although a showing of disparate impact on its own is typically insufficient to show an equal protection violation, "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." 🔖 *Davis*, 426 U.S. at 242. Mr. Rios-Montano contends that Mexicans and other Latin Americans make up the vast majority of individuals apprehended at the border and that Mexicans historically accounted for upwards of 84 percent of unlawful entry convictions, which supports a finding that 🔖 Section 1325 bears more heavily on Latinx people. ECF No. 70 at 18–19, 21. The Government does not dispute the statistics cited by Mr. Rios-Montano, but argues they are due solely to Mexico's geographic proximity to the United States and that Mr. Rios-Montano therefore cannot show disparate impact. ECF No. 71 at 14. [4]

Although the Government's observation that immigration laws will almost always disproportionately affect Mexican and Latin American defendants is accurate, it does not answer the threshold question of whether the challenged law "bears more heavily on one race than another." 🔖 *Davis*, 426 U.S. at 242. The Government's interpretation of disparate impact would seem to require a party challenging a law under the *Arlington Heights* intent test to show not only that a law had a discriminatory purpose, but also that it was not neutrally applied. But an official action taken with a discriminatory purpose that disproportionately affects the disfavored group accomplishes the invidious motive, even if those tasked with its enforcement do not take the further step of selectively enforcing the law or policy against the disfavored group. In *Arlington Heights* itself, the Court found that the zoning restriction limiting the building of low-cost housing may have disparately impacted African Americans, even though that disparate impact was due to African Americans being disproportionately represented among those eligible for low-cost housing, much like the disparate impact here is due to Latinx people being disproportionately represented among those apprehended at the border. [5] *See* 🔖 *Arlington Heights*, 429 U.S. at 270; *cf. Dumas*, 64 F.3d at 1429 (accepting fact that "the heavy penalties for crack-related offenses

2020 WL 7226441

disproportionately affect Blacks because Blacks are more likely to possess crack than Whites" as evidence of disparate impact). The plurality in *Regents* merely restated the settled principle that disparate impact alone, absent other evidence of discriminatory motive, is insufficient to state a claim under *Arlington Heights*. *Regents*, 140 S. Ct. at 1915–16. It is true that immigration policies will frequently have a disproportionate impact on a particular racial group. But because these policies will often be "plausibly explained on a neutral ground," *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 275 (1979), the intent test requires additional evidence of an insidious motive before finding the law unconstitutional. *See Davis*, 426 U.S. at 242 ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution.").

**\*8** Accordingly, although Latinx people are likely disproportionately affected by Section 1325, the disparate impact alone in this case is not stark enough to show discriminatory motive, given that the disparity is explainable on grounds other than race. *See Arlington Heights*, 429 U.S. at 266. The Court therefore finds that Mr. Rios-Montano has not met his burden of showing that Congress acted with a racially discriminatory motive in enacting Section 1325.

**III. Conclusion**

For the foregoing reasons, Defendant's motion to dismiss the Superseding Indictment under *Arlington Heights* is **DENIED.**

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 7226441

**Footnotes**

1    The plurality did not determine the merit of the Government's argument that the more deferential standard applicable to claims of selective enforcement in deportation proceedings should apply to the Court's review of DACA, an issue not present here. *Regents*, 140 S.Ct. at 1916.

2    Although Mr. Rios-Montano points out that the crime of attempt does not exist independent of the substantive offense of unlawful entry, under settled Ninth Circuit law, prior to the Immigration Act of 1990, he could not have been charged with attempted unlawful entry. *See United States v. Chi Tong Kuok*, 671 F.3d 931, 941 (9th Cir. 2012) (quoting *United States v. Hopkins*, 703 F.2d 1102, 1104 (9th Cir. 1983)) ("[T]here is no general federal 'attempt' statute. A defendant therefore can only be found guilty of an attempt to commit a federal offense if the statute defining the offense also expressly proscribes an attempt."). It is therefore the 1990 law that gives rise to Mr. Rios-Montano's asserted constitutional injury in this case. Even if the Court treated unlawful entry as the relevant statutory provision, Section 1325 has been recodified several times since 1929, and Mr. Rios-Montano has not submitted evidence showing the intent of these later Congresses.

3    The *Hayden* court also addressed the concern that "a legislative body might seek to insulate from challenge a law known to have been originally enacted with a discriminatory purpose by (quietly) reenacting it without significant change," but found that the case at issue did not present such a concern. *Hayden*, 594 F.3d at 167. Similarly, Mr. Rios-Montano has not argued that the 1990 legislature had such a purpose in mind; instead, he suggests that Congress did not "recognize or address" the provision's racist past. ECF No. 80 at 5.

4    Mr. Rios-Montano also points to the current administration policy of wielding § 1325 as a tool of mass prosecution in support of its disparate impact position. ECF No. 70 at 22–23. While the executive department's current immigration policies appear to echo the racist tone and objectives of the 1929 Congress, they are not salient in determining whether the 1990 legislation was affected by a discriminatory motive.

5    *Ramos v. Wolf*, which found that the revocation of Temporary Protected Status ("TPS") did not "bear more heavily" on one racial group than another, presents a somewhat different issue. *Wolf*, 975 F.3d at 898. Because individuals from Latin American countries were the primary beneficiaries of TPS designations, the revocation of virtually any TPS designation would disproportionately affect individuals from Latin America, which the Ninth Circuit found not to be probative of discriminatory intent under *Arlington Heights. Id.*

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   8