# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

May 23, 2022

<u>By ECF and Hand Delivery</u>
Honorable Victor Marrero
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     **United States v. Manuel Suquilanda**
        **21 Cr. 263 (VM)**

Dear Judge Marrero,

Mr. Suquilanda pled guilty to illegally reentering the United States. He has accepted responsibility for his crime – his only conviction for illegal reentry – and he will stand before the Court for sentencing on May 27, 2022.

Since reentering the country, Mr. Suquilanda has only engaged in productive pursuits that have benefitted his family and his community. He has stayed completely out of trouble; he has no convictions since his return to this country. He has worked full-time; he is a valued employee of a construction company. He has been awarded full custody – as a single father – of his troubled teenage daughter by the Bronx Family Court and he is in the process of gaining formal custody of his younger daughter too because they were in danger in their mother's care; he is a loving and devoted parent, who is helping his U.S. citizen daughters navigate challenges in their own lives.

No jail time is necessary in this case. Mr. Suquilanda's adjusted offense level is <u>six</u>; i.e. it is squarely within Zone A of the sentencing table. With zero criminal history points, his Guidelines range is 0-6 months (indeed, it was 0-6 months even <u>before</u> subtracting the applicable acceptance of responsibility points). To send him to jail is inconsistent with the statutory goals of sentencing and the interests of justice. It is also contrary to his proven track record on supervision: Mr. Suquilanda has been out on bail for 14 months and has been completely compliant. Mr. Suquilanda has demonstrated – overwhelmingly – that he can follow the rules of the Court.

**Personal Background**

Manuel Suquilanda was born in 1982 and raised in a small farming community in a rural part of Ecuador.  Mr. Suquilanda, his parents, and his 5 older brothers and sisters lived in a small home made of cinderblocks, that was located on an unpaved, dirt road.  The bathroom was located outside.  As a child, Mr. Suquilanda went to school each day and then returned home to help with the farm and the animals: his mother raised livestock so the family would have food to eat and to sell.  Their puebla made bricks and Mr. Suquilanda's father worked as a bricklayer, constructing buildings.

Mr. Suquilanda grew up in a traditional home: they attended local Catholic church services weekly and spent their free time tending to the farm and playing soccer.  Mr. Suquilanda learned to read and write in Spanish at elementary school in Ecuador.  After the 6th grade, school cost money, which his parents did not have.  Thus, he left school to work full-time.  He worked on the farm and when he was as young as 13, his parents would send him to the capital to earn extra wages working in a hardware warehouse.

Over time, four of Mr. Suquilanda's siblings immigrated to the United States to seek a better life.  They each moved to Bronx, New York, where they worked hard and sent money home to their parents.  In approximately 1999, when he was still a teenager, Mr. Suquilanda followed suit.  Assisted by his older siblings, he came to New York and went to work.  A childhood friend writes: "There is not much opportunity to work in Ecuador and we did not have access to education. We needed to work in agriculture or construction. Manuel left our country to improve himself and seek a better life."  Exhibit C, Letters from Family and Friends, Friend Leonardo Nanito.  Mr. Suquilanda sent money home to his parents every month – which he continues to do through today.  His niece writes: "he is a hardworking man who always does his best in this country to support both his parents and his brother in Ecuador. He has always been aware of their well-being."  Id., Letter from Niece Rosa Barbecho.

Mr. Suquilanda has primarily worked as a carpenter.  He has been employed for years-long terms at three different construction companies.  Mr. Suquilanda has a strong work ethic and is regarded highly by his employers.

Mr. Suquilanda was deported following a 2005 Bronx County conviction for statutory rape (he was alleged to have impregnated his underage girlfriend; that pregnancy did not produce a child).  See PSR ¶ 27.  While there is no doubt that such a conviction is serious – indeed, Mr. Suquilanda pled guilty to a felony and was ordered to register as a sex offender – there are factors about that conviction that bear highlighting.  See id.  First, despite the nature of the charges, the state court did not sentence Mr. Suquilanda to jail; instead, he was sentenced to 10 years of probation.  See id.  This may have been because he and the victim were in a consensual romantic relationship and intended to marry; the lack of consent element was due to her age.  See id.

Mr. Suquilanda now has 3 daughters, ████████ and ████████████ whose mother is Ana Quintana, and ████████████ whose mother is Erendira Zuniga.  All three girls are

United States citizens.  Mr. Suquilanda's relationships with Ana and Erendira did not last, but his relationships with his daughters have been strong throughout their entire lives.  Mr. Suquilanda has always supported them emotionally and financially.  "He was always there working hard to give them not only the material things they needed, but also a lot of love, that is the most important thing for children…He just wanted to see them happy."  Exhibit C, Letters from Family and Friends, Niece Rosa Barbecho.

**Offense Conduct and Guidelines Calculation**

Mr. Suquilanda returned to the United States unlawfully.  His primary goal was to make things better for his family.  He wanted to work to earn money to send back home to his parents, and to be an active father.  Still, he knows that doing so was a crime.  For that crime, he pled guilty to the instant felony and accepted full responsibility for his choices.  The Government writes that "[h]is justifications for returning to the United States, whatever they may be, do not absolve him from taking responsibility for his criminal conduct."  See Gov't Sent. Ltr. 3.  We agree, which is why Mr. Suquilanda has taken responsibility for his conduct, by pleading guilty and in his plea allocution: "I did not have permission to return to this country. I knew that I did not, that I was not allowed, and I apologize for my actions."  See PSR, ¶ 15.  But, Mr. Suquilanda's reasons for committing this crime do matter – and they should matter to the Court and to the Government – because they clearly distinguish him from those who return to the United States to violate the drug laws, commit violent crimes, or break any other laws of our country.

The parties and Probation agree on the applicable Guidelines calculation.  The adjusted offense level is 6 (8 points minus 2 for acceptance of responsibility) and because he has 0 criminal history points, he is in criminal history category I.  The resulting range is the lowest possible one on the Table: 0-6 months imprisonment.

**Mr. Suquilanda's Otherwise Law-Abiding Life in the United States and Post-Arrest Conduct**

Since his return to the United States, Mr. Suquilanda has continued making contributions to his family and community.  He has also incurred <u>no</u> further criminal convictions whatsoever.

In the last couple of years, including while this case has been pending, Mr. Suquilanda has become a far more active father.





Mr. Suquilanda also remains closely connected with his third daughter, who lives in Brewster, New York, with her mother.  His family and friends all describe him as a loving and dedicated father to all three girls.  See, e.g., Exhibit C, Letters from Family and Friends, Godson Oralis Icelo ("I have seen Manuel give all his time and dedication to his daughters"); Letter from Cousin Gustavo Suquilanda ("He would go without eating so that his daughters can eat. His daughters are his world"); Letter from Cousin Jose Angel Niola Suquilanda ("I have seen how much and how hard Manuel has worked to give his daughters everything that they need").

Mr. Suquilanda also spends time with his four brothers and sisters (who reside in the Bronx) and their children.  His brother writes: "My brother…is a very cheerful, understanding and responsible person.  He always helps me as much as he can…we like to take our daughters for walks together whenever we have time."  Id., Letter from Brother Jose Suquilanda.  His niece, Maria, who is close in age to Mr. Suquilanda, writes that he has been a role model for her son: "I became a single mother and Manuel was always supporting me.  My son ▇▇▇ was the little boy who would always want my uncle to play with him…and [Manuel] would take care of him when I had no babysitter so I could work on the weekends."  Id., Letter from Niece Maria Barbecho.  "We have shared birthdays, Christmases, and many other occasions and I can say that it is a pleasure to spend time with him and his daughters."  Id., Letter from Niece Rosa Barbecho. In addition to his time with his family, Mr. Suquilanda enjoys playing volleyball in Oval Park with other Ecuadorian immigrants; they call it "Ecua-voly."  He has made many friends and built

Honorable Victor Marrero                                                    May 23, 2022
United States District Judge                                                       Page 5

a community around that sport.  See id., Letter from Friend Boris Montesdeoca ("We met
playing volleyball…To this day, we still have that close friendship and we are like family").

     He has also stayed connected with his family in Ecuador.  One of his brothers remains in
Ecuador, as does his mother, who is now retired and 78 years old.  Mr. Suquilanda continues to
send his mother money from his monthly wages.  His mother is more reliant on her children
since their father died in 2018, and as her health has worsened. ██████████████████
████████████████████  See id., Letter from Niece Rosa Barbecho.  "Manuel always calls her on the
phone and does everything possible to support her with medicines or whatever else is needed for
her recovery."  Id.  If he is ordered to return to Ecuador, Mr. Suquilanda will be grateful for the
opportunity to care for his mother daily.

     Mr. Suquilanda has worked for his current employer, the John and Joseph Bonanno
Corporation, for more than 3 years.  He works 6 days each week, from Monday through
Saturday, from 8am to 5pm, for them as a carpenter.  See Exhibit B, Letter from John Bonanno.

     Since his arrest in March 2021, Mr. Suquilanda has been entirely compliant with all of
the conditions of his release.  See PSR ¶ 5.  He was released from presentments and reported the
next day to be outfitted with an ankle monitor, which he has worn ever since.  A week later, on
March 25, 2021, at the request of Pretrial Services, and without objection from the government,
Mr. Suquilanda's bail condition was changed from home detention to electronic monitoring with
a curfew.  He has now been in compliance with that curfew – and all other terms of his bail – for
more than 14 months. Thus, this Court can have complete confidence that Mr. Suquilanda will
continue to follow the rules once he is sentenced.

**Plans for the Future**

     Mr. Suquilanda's plea agreement expressly reserved his right to appeal the instant
conviction, and our office and Mr. Suquilanda are committed to seeing that process through.  See
Plea Agreement, dated December 10, 2021.[1]  Mr. Suquilanda knows and accepts that he may
face deportation in the future; his eyes are wide open as to his status and the litigation journey
that he faces in immigration court.

     As both of those processes proceed in their respective courts, Mr. Suquilanda has
demonstrated that he will continue to go to work, and parent his children, and stay out of trouble.

---

[1] Specifically, the agreement gives Mr. Suquilanda the right, with the government's consent, "to
appeal the two issues addressed in the district court's October 20, 2021 decision and order
(Docket No. 39) denying the defendant's motion to dismiss the Indictment: (i) whether the
omission from the defendant's Notice to Appear of the date, time, and place of the initial hearing
and the address of filing precluded jurisdiction from vesting in the immigration court that
ordered the defendant's removal in 2005, and (ii) whether 8 U.S.C. § 1326 discriminates against
Latinx persons in violation of the equal protection component of the Fifth Amendment's Due
Process Clause."

Honorable Victor Marrero                                                    May 23, 2022
United States District Judge                                                     Page 6

If the day comes that Mr. Suquilanda is removed from the U.S., he and his family will make the
necessary arrangements for that significant change in all of their lives.

    First and foremost, if he is removed from this country, Mr. Suquilanda has a safe place to
live: he can reside with his mother in their family home in Ecuador.  See Exhibit C, Letters from
Family and Friends, Letter from Brother, Jose Suquilanda.  His experience working in carpentry
in the United States will make him employable in Ecuador too.

    Fortunately, Mr. Suquilanda's daughters are approaching legal adulthood.



**Appropriate Sentence**

    In selecting a sentence, this Court takes as its "lodestar the parsimony clause of 18 U.S.C.
§ 3553(a)."  United States v. Douglas, 713 F.3d 694, 700 (2d Cir. 2013).  That provision "directs
sentencing courts to 'impose a sentence sufficient, but not greater than necessary, to comply
with' the factors set out in 18 U.S.C. § 3553(a)(2)."  Id.  "Those factors are, broadly speaking,
proportionality, deterrence, incapacitation, and rehabilitation."  Id.

    A non-incarceratory sentence is wholly sufficient to achieve the goals of sentencing.
Indeed, such a sentence is endorsed by the Guidelines here.  On its face, a range of 0-6 months
clearly includes a non-incarceratory sentence, i.e. 0 months. Moreover, because this range is
located in Zone A of the Sentencing Table, "a sentence of probation is authorized" explicitly by
the Guidelines.  See U.S.S.G. § 5B1.1(a)(1).

    Even a short term of imprisonment, which the Government and Probation advocate for,
would do far more harm than good.  It would simply cause chaos in Mr. Suquilanda's ability to
care for his children, maintain his apartment, and continue his job.
                                          Removing Mr. Suquilanda from his children before the appeals and
immigration courts make their final decisions about his fate is wholly unnecessary to achieve the
statutory goals of sentencing.  It is also wholly disproportionate for this non-violent crime and
for a person who has not been convicted of a crime in more than 15 years.

    Moreover, since the COVID-19 pandemic, and the resulting realities of federal
incarceration, any jail sentence in this case is greater than necessary.  The government argues

that COVID is only impactful on prisoners' health (and which is abated by the prevalence of vaccines).  See Gov't Sent. Ltr. 3.  But that analysis completely ignores how life in our federal jails has changed during the pandemic.  In addition to the obvious health risks, "[t]here are all sorts of restrictions on access to family, on access to counsel, on access to telephones, on access sometimes to legal materials, and it's a much harder experience I've seen this in case and after case during COVID."  United States v. Hagood, 20 Cr. 656 (PAE), Tr. Nov. 5, 2021, 38:21.  As a result, federal prison is, simply, "way more arduous than it's supposed to be."  Id. at 24:8-11.  Incarcerated individuals are experiencing lockdowns and lock-ins, which deprive them of tools that used to promote their sanity and rehabilitation: family visits, hot food, regular exercise, and educational programming. Without such basic privileges, even a short prison sentence is excessively harsh.

We urge the Court to consider this new reality as it decides on the appropriate sentence.  Indeed, the state of our local facilities has caused other courts in this district to vary downwards – and decline to impose prison at all.  As Judge McMahon recently put it, "in ordinary circumstances, I would have probably felt it necessary…to send you away for a while. I'm not going to do that because of the circumstances in which we find ourselves…with conditions getting worse all over the country, to put you in and to break up another family and to put your life in danger in that way." United States v. Camacho, 19 Cr. 389 (CM), Dkt. No. 77 (Dec. 18, 2020) (declining to impose an incarceratory sentence).

 No jail time is necessary to punish or deter Mr. Suquilanda going forward.  A Guidelines-sentence of probation or time served with supervised release will still be a significant infringement on Mr. Suquilanda's liberty.  Indeed, "[o]ffenders on probation are…subject to several standard conditions that substantially restrict their liberty."  Gall v. United States, 552 U.S. 38, 48 (2007); see also id. n.4 ("[T]he probation or parole conditions imposed on an individual can have a significant impact on both that person and society") (internal citations omitted).  Most importantly, a term of probation or supervised release will enable the Department of Probation to monitor Mr. Suquilanda and ensure that he remains on his current, positive trajectory.  Probation will also be able to monitor his compliance with Family Court Orders and his compliance with Immigration authorities.

Moreover, if the Court thinks additional punishment is necessary, it has other, far more appropriate tools to accomplish that in this case: the Court can add conditions of home detention or community service or a fine to increase the punitive nature of the sentence, if it so wishes.  Because Mr. Suquilanda has zero criminal history points, he is in a group that "present[s] a significantly lower risk of recidivism than any other group of federal offenders."  See U.S. Sent'g Comm'n, The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders, at 6-7 (March 2017). [2]  In fact, the Sentencing Commission found that "[o]ffenders with zero criminal history points" have a "lower rearrest rate" than even offenders with one criminal history point.  Id.

---

[2]  Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf

Honorable Victor Marrero                                    May 23, 2022
United States District Judge                                      Page 8

     Mr. Suquilanda has learned his lesson from this prosecution: he should not have reentered the United States without permission.  He has spent the last 14 months, while this case has been pending, coming to terms with the fact that his time in this country is likely coming to an end.  While that process has played out – and will continue to play out – Mr. Suquilanda has remained the hard-working, loving father – and brother and son and uncle and friend – that he has always been.  He has shown up for every court date and he has followed all the rules of his release.  He will continue to do so as the appeals and immigration courts pass their judgments.  And when it comes time for him to leave the United States, he will rejoin his mother and brother in Ecuador and find a way for his daughters to visit him either permanently or regularly.  His children will soon be adults and he knows he was lucky to have been present for their adolescence; if he must parent from Ecuador going forward, he and his daughters are prepared for that.

**Conclusion**

     For all of these reasons, a sentence of probation or time served with supervised release is sufficient and not greater than necessary.

Respectfully submitted,

/s/
Sylvie Levine
Counsel for Mr. Suquilanda